**Luise M. ROSS, Plaintiff,**

v.

**ARCATA GRAPHICS COMPANY, Defendant.**

**No. 88–CV–351E.**

United States District Court, W.D. New York.

March 31, 1992.

---

David P. Marcus, Buffalo, N.Y., for plaintiff.

Robert A. Doren, Colleen O'Connell Jancevski, Buffalo, N.Y., for defendant.

## MEMORANDUM AND ORDER

ELFVIN, Senior District Judge.

The plaintiff ("Ross") brings this action alleging·that she was discharged from her employment because of her age, gender and national origin in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and section 296 of New York's Executive Law ("Exec. L."). Ross also alleges that her discharge constitutes a breach of contract and wrongful discharge.

Presently the defendant ("Arcata") moves for summary judgment arguing that Ross has failed to establish that her discharge was improperly based on age, gender or national origin and that her Exec.L. § 296 claim is barred because Ross elected a remedy pursuant to Exec.L. § 297. In

her answering papers Ross has withdrawn her gender discrimination claims, her breach of contract claim and her wrongful discharge claim, leaving for determination only those claims of discrimination based on age and national origin.

Ross was hired by Arcata in 1972 as a non-exempt part-time secretary to the Professional Services Manager. Within one year she was given the title "Assistant to the Professional Services Manager." In December 1974 Ross was promoted to a full-time position as a Recruiter. Six months later she was given the position of Assistant Personnel Manager and held such position until her dismissal in April 1986, at which time she was fifty-nine years old.

In her capacity as Assistant Personnel Manager Ross was responsible for recruitment, wage and salary administration and administration of the Organization Management Development Plan. During her tenure at Arcata, Ross consistently received favorable performance evaluations. In her last review before her termination Ross was rated as a "# 5" in each of the review categories. Arcata defines # 5 as "an individual who meets the high standards of performance expected for this position and who is recognized as functioning at the level of a fully effective and qualified employee." *See* Plaintiff's Affidavit in Opposition to Motion for Summary Judgment, Exhibit F.

In January 1986 Robert Swam, President of Arcata, told corporate managers that a ten percent cost reduction was necessary. At this time Wes Zimmer was the head of the Buffalo Division of Arcata, for which position he had been hired in 1983. Since assuming that position, Zimmer attempted to establish a new atmosphere at the division and repeatedly stated that he wanted "new blood" and "fresh blood" in the division. In exploring ways to achieve the necessary cutbacks, Arcata considered offering an incentive retirement plan; however such plan was rejected in early February.

On March 7, 1986 Donald McCready was hired to replace Frank O'Connor as Human Resource Manager. O'Connor claims that he was asked to leave such position because he was not in agreement with Arcata's policy to terminate people without regard for seniority in order to effectuate the cost reductions. During his second week of employment at Arcata, McCready met individually with all the employees in the Human Resource Department. He met with Ross and, noticing that she had a German accent, asked her if she were German. After she stated that she was, he commented, "You know what they say about Germans?" After conducting these interviews, McCready decided that there were too many employees in the department and that three employees would have to be discharged. He never specifically stated why he decided that three people needed to be discharged, except to say that from his past experience he knew he could run the department with fewer people.

On March 27, 1986 McCready sent a memo to various managers stating his "Get Well Recommendations" for the Buffalo Division. One of these recommendations was to "ferrett [sic] out employees who have peaked and leveled out in their career [sic]." Another was to create an active intern program with a college or university from which the division could recruit new engineers.

Sometime during this period during which Arcata was considering cutbacks, Zimmer requested a list of persons who were over fifty-five years of age and highlighted various names on this list. He also requested that a list of employees who were rated as "stable" in their careers. On April 2, 1986 Zimmer notified various managers that he had asked McCready to put together a "need" chart which would identify essential and non-essential information being generated by various employees. In deciding which employees were to be fired, Arcata considered whether the jobs they were respectively performing were necessary to the efficient functioning of the corporation. Zimmer states that he looked at what functions were needed in order to run the company effectively and then decided who could perform those functions. In de-

termining who could, Arcata looked at personal performance, ability to assume additional tasks and overall job knowledge. While Arcata now has articulated the above criteria for the discharges, there are no contemporaneous records indicating the criteria which were used. All decisions were reached during meetings and no minutes of those meetings are available.

On April 11, 1986 McCready discharged three employees from his department. Irene Kuzon, an Executive Secretary, age 65, the oldest employee in the department, was discharged because her position was consolidated with a secretary's position from another department. Ross, age 59, the third oldest employee in the department, was discharged because her position was consolidated with the Personnel Manager's position.[1] Benedicta Buchta, age 21, was transferred to another department because her position was eliminated.

Arcata claims that Ross was discharged because it had decided that Gerard Rath, the Personnel Manager, would be able to carry on the functions of both the Personnel Manager and the Assistant Personnel Manager. Arcata, therefore, merged the two positions and Ross was discharged. A personnel action form completed for Ross indicated that she was discharged because of "Department reorganization to meet challenges of the 80's—Position eliminated and merged into the Personnel Manager's functions." In April 1989 Rath was fired for poor job performance and Ross was not recalled. In October 1987 John Brennan, age 35, was hired to replace Rath as Personnel Manager.

All Arcata employees who were discharged in the 1986 layoffs were entitled to severance pay which included one week of salary for every year of service up to twenty-six weeks total and accrued vacation. In order to receive this severance, Arcata required that the employee sign the following release:

"I acknowledge that by signing this agreement, I voluntarily accept this arrangement in settlement of and release Arcata Graphics Company, Arcata Graphics/Buffalo from any claim I may have arising out of my employment or the termination thereof, including but not limited to claims for severance, vacation and termination pay, lost wages and continuation of employment, excluding only benefits I may have under the Arcata Pension Plan. I understand and agree on behalf of myself and my estate that if I breach this agreement or if I or my estate commences any proceeding against the Company, all payments and benefits provided herein shall cease and I or my estate shall be required to reimburse the Company for all payments and benefits I received under this agreement prior to such time."

Ross signed this release, which was included in a Release and Severance Agreement, immediately after she had been told that she was being discharged. McCready, who asked her to sign the release, observed that she was shocked and very upset. Ross received severance pay of $12,148.40 which was paid to her in installments from April 18, 1986 to July 18, 1986 and during this period she was provided with all the group medical, hospitalization and life insurance benefits she had been receiving while actively employed.

Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. rule 56(c). In making such a determination, a court must view the facts in the light most favorable to the non-moving party and any doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

The moving party bears the initial burden of establishing that no genuine issue as to a material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the non-moving party would bear the burden of proof on a claim at trial, the moving party may satisfy its burden by

1. The second oldest employee in the department was one Buase, age 60, an Industrial Nurse.

demonstrating an absence of evidence to support an essential element of such claim. *Id.* at 325, 106 S.Ct. at 2553–54. Once the moving party has established its initial burden, the non-moving party must set forth specific facts showing that there is a genuine and material issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Such a showing must consist of more than a "scintilla of evidence"; the nonmoving party must show that there is evidence from which a reasonable juror could return a verdict in his or her favor. *Id.* at 252, 106 S.Ct. at 2512.

■ Ross's first claim is that she was fired because of her national origin in violation of Title VII. The only evidence that she offers in support of this claim is the single remark made by McCready during the interview with him. According to Ross, McCready stated, "You know what they say about Germans?" This Court finds that such an ambiguous single remark is not enough from which a reasonable fact-finder could infer that Arcata was motivated by national origin in dismissing Ross and, therefore, summary judgment on this issue must be granted in favor of Arcata.

■ Turning to Ross's ADEA claim, Arcata first seeks summary judgment that Ross, by signing the Release and Severance Agreement, waived her right to bring a suit under ADEA. Such a waiver is permissible if the totality of the circumstances indicates that the waiver is made knowingly and willfully. *See Bormann v. AT & T Communications, Inc.,* 875 F.2d 399, 403 (2d Cir.), *cert. denied,* 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989). In such case the United States Court of Appeals for the Second Circuit cited the following factors as relevant in determining whether a waiver was voluntarily made:

"1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law." *Id.* at 403 (quoting from *EEOC v. American Exp. Pub. Corp.,* 681 F.Supp. 216, 219 (S.D.N.Y.1988)).

The Court added that it should also be considered whether an employer encouraged or discouraged an employee from seeking the advice of an attorney and whether the employee had a fair opportunity to do so. *Id.*

The waiver Ross signed supposedly released Arcata from "any claim" arising out of her termination. It does not specifically state that she was releasing her right to file an action under ADEA. This release was contained in a severance agreement Ross was handed shortly after she had been informed that she was terminated. She was asked to sign it on the spot. Ross did not have any input into the content of the severance agreement and was required to sign it in order to receive her severance benefits. She did not contact an attorney, Arcata did not recommend that she do so and she was not even given an opportunity to do so. While Ross is an educated and experienced businessperson who might have been able to intelligently waive her rights in a bargaining situation, there is no indication that there was any discussion about the severance agreement; either she would sign it and get her severance benefits or she would not sign and not receive such benefits. Given these circumstances, this Court finds that Ross did not voluntarily waive her right to file an action under ADEA.

Next Arcata argues that Ross has failed to make a *prima facie* showing of age discrimination and that, even if she has made such a showing, she has failed to present enough evidence for a jury to find that Arcata's stated reason for her discharge—a reduction in work-force—was a pretext.

■ ADEA makes it unlawful for an employer to discharge an individual be-

cause of an individual's age. *See* 29 U.S.C. § 623(a).[2] In order to determine whether a plaintiff has presented sufficient evidence to allow an ADEA claim to go to a jury, courts have relied on two different methods of analysis. If "direct" evidence were presented that an employer was motivated, at least in part, to take an adverse employment action because of age, a "mixed motive" or *"Price Waterhouse"* analysis would be used and, upon a showing that age played a motivating part in the employment decision, the employer could avoid liability only by showing that it would have taken the same action even if it had not considered the plaintiff's age. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794–95, 104 L.Ed.2d 268 (1989).[3] If no "direct" evidence were presented, then the courts would use a three-part "pretext" or *"McDonnell Douglas"* analysis. First, the plaintiff must establish a *prima facie* case of employment discrimination by showing a facially discriminatory action by the employer. Next, the employer would have to articulate a non-discriminatory reason for the action. Finally, the plaintiff had to show that either the discriminatory reason more likely motivated the employer's action or that the employer's explanation was unworthy of belief. *See Texas Dept. of Community Affairs v. Burdine* (*"Burdine"*), 450 U.S. 248, 252–256, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green* (*"McDonnell Douglas"*), 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

The problem that has faced the courts since *Price Waterhouse* is whether the evidence offered by a plaintiff is direct or not direct and, based on this determination, which mode of analysis should be applied. Recently the United States Court of Appeals for the Second Circuit has addressed this problem in clarifying the instructions to be given to a jury in an ADEA case. *See Tyler v. Bethlehem Steel Corp.* (*"Tyler"*), 958 F.2d 1176 (2d Cir.1992). While such case mainly addressed the requirements of jury instructions, the discussion provides some directions as to how a court should view direct evidence and apply the burden of proof in an ADEA case.[4]

In *Tyler*, the Court first notes that the distinction between direct and indirect evidence was present only in the concurring opinion of Justice O'Connor. *Id.* at 1182. The direct evidence requirement was not, it was noted, adopted by the plurality of four or by the concurring opinion of Justice White. The Court went on to find that a majority of the Justices endorsed, in *Price Waterhouse*, the burden-shifting framework for mixed motives that was articulated in *Mt. Healthy City Board of Ed. v. Doyle* (*"Mt. Healthy"*), 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[5]

The *Tyler* Court then points out that requiring direct evidence—*i.e.*, non-circumstantial evidence—as a precondition to offering a *Price Waterhouse* charge to the jury makes little sense in light of the general rule governing civil litigation that a jury can give weight to circumstantial evidence equal to, or even greater than, direct evidence in making their determination. *Id.* at 1184. It then is explained that, in fact, when courts refer to direct evidence they seem to be referring not to the quality

---

**2.** Such section states in relevant part:
"It shall be unlawful for an employer—
"(1) * * * to discharge any individual * * * because of such individual's age * * *."

**3.** The Civil Rights Act of 1991, Pub.L.No. 102–166, 105 Stat. 1071, modified the holding of *Price Waterhouse;* however, for the purposes of this motion it is not necessary to consider its applicability to this case.

**4.** While the Court in *Tyler* was specifically considering the adequacy of a jury charge, it is equally applicable to the decision about how to decide a summary judgment motion because the burden that the plaintiff must satisfy in order for a judge to send the case to a jury cannot be stricter than the burden a plaintiff would need to carry in order to establish her case before the jury.

**5.** In *Mt. Healthy,* the Court held that a plaintiff must first show that an illegitimate factor was a substantial or, in other words, a motivating factor in the employer's decision and that the burden then shifted to the defendant to show that it would have taken the same action regardless. *See Mt. Healthy, supra,* at 287, 97 S.Ct. at 576.

of the evidence that a plaintiff has offered but the manner in which she or he proves her or his case. Direct evidence means that a plaintiff proves her or his case by offering sufficient evidence for a reasonable jury to find that she or he was discharged because of age. *Id.* at 1185. In non-direct evidence cases, a plaintiff first shows that there is *prima facie* case of a discriminatory result by establishing that the discharge did not result from the two most common legitimate reasons—lack of qualifications or lack of vacancy in the job sought. Once a *prima facie* case has been shown, the employer must articulate a legitimate nondiscriminatory reason for its action. If the employer does such, then and in order to prevail, the plaintiff must produce enough evidence for a reasonable jury to find either that the discriminatory reason more likely than not motivated the employer or the employer's proffered explanation should not be believed. The Court observed that, in effect, a plaintiff's burden in the "direct" evidence case under *Price Waterhouse* is the same as a plaintiff's burden of proof under the last step of *McDonnell Douglas. Id.* at 1185–86. In either case, a plaintiff can satisfy her or his burden of proof by producing enough evidence to show that the discriminatory reason motivated the employer.

The *Tyler* Court explains that the difference between the two approaches is that, under *McDonnell Douglas,* a plaintiff begins by focusing on her or her qualifications and the employer's needs, while under *Price Waterhouse* she or he begins by focusing on the discriminatory conduct. *Tyler, supra,* at 1185–86. Thus, when a plaintiff begins by focusing on the discriminatory conduct by initially offering evidence of discrimination, there is no need for this Court to apply the *McDonnell Douglas* analysis.

▆ From the discussion in *Tyler,* it is clear that the distinction between direct evidence and indirect evidence need not be made. If a plaintiff offers only evidence of facially discriminatory results—that is, that she or he was a member of a protected class and was qualified for the position and

was discharged and was replaced by a younger worker—, a court should then consider the claim under a *McDonnell Douglas* analysis. However, if a plaintiff presents in the first instance enough evidence for a reasonable jury to find that she or he was fired, at least in part, because of age, a court should then consider her or his claim under a *Price Waterhouse* analysis.

▆ An additional consideration, however, becomes a factor in a reduction-in-force case. In order to establish a *prima facie* case of a discrimination in such circumstances, a discharged employee must show that (1) she or he was in the protected age group, (2) she or he was qualified for the job, (3) she or he was discharged and (4) the discharge occurred under circumstances that give rise to an inference of age discrimination. *See Montana v. First Federal S. & L. of Rochester,* 869 F.2d 100, 104 (2d Cir.1989). While the first three requirements are the same as under *McDonnell Douglas,* the last one is different in order to account for the fact that in a reduction in work-force case there will be no younger employee hired—the last requirement of *McDonnell Douglas's prima facie* case.

Obviously the amount of evidence that a plaintiff must present in order to establish this last requirement of a *prima facie* case in a reduction-in-force situation—a modified *McDonnell Douglas prima facie* case—cannot be the same as required under *Price Waterhouse* because such would collapse the difference between the analyses in that both would require a court to find in the first instance that the plaintiff had presented sufficient evidence for a jury to find that age motivated the employer. This would defeat the purpose of the *McDonnell Douglas* analysis. The *prima facie* case under *McDonnell Douglas* was not meant to be onerous—*see Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093–94—but was meant to allow a protected person who only suspected that adverse employment consequences were caused by discrimination to get into court by showing that the action did not result from the two most common legitimate reasons for em-

ployment actions. *Tyler, supra,* at 1185. Therefore, the evidence that a plaintiff must produce to give rise to an inference of discrimination under the fourth requirement of a *prima facie* case in a reduction-in-force situation can only mean that she or he must present some evidence that a discriminatory reason may well have entered the decision-making process. It cannot mean that the evidence that is offered must be sufficient to support a jury verdict in her or his favor. In fact, the United States Supreme Court in *Burdine* noted that it was using the term *"prima facie* case" to refer to the establishment of a legally mandatory, rebuttable presumption, and not to a plaintiff's burden of producing enough evidence to permit a trier of fact to infer the fact at issue. *See Burdine, supra,* 450 U.S. at 254 fn. 7, 101 S.Ct. at 1094 fn. 7. Thus to establish a *prima facie* case, a plaintiff has only to offer evidence of acts that, if otherwise unexplained, would give rise to an inference of discrimination. *Id.* at 254, 101 S.Ct. at 1094. Once a plaintiff has done such and the employer has articulated a legitimate reason for the action, she or he then has the burden of producing enough evidence for a reasonable jury to be able to find in her or his favor.

■ Therefore, in deciding a summary judgment motion, a court need not determine whether the evidence presented by a plaintiff is direct or indirect—*i.e.,* circumstantial—but must determine whether she or he has presented sufficient evidence to find that age motivated the employer. If she or he has been able to present such, a summary adverse judgment is not then warranted unless the employer can show as a matter of law that it would have taken the action regardless. If such plaintiff has not presented enough evidence for a jury to find that age was a motivating factor, then the court should consider whether she or he has offered enough evidence for a jury to find a *prima facie* case under *McDonnell Douglas.* If such has been shown and the employer has offered a legitimate reason, the court must decide whether such plaintiff has presented enough evidence for a reasonable jury to find that the employer's proffered reason was a pretext. If she

or he carries this burden, summary judgment of dismissal must be denied.

■ Applying the above discussion to the present case, in order to defeat Arcata's motion for summary judgment, Ross must show that there is enough evidence for a reasonable jury to find that she was discharged because of her age in violation of ADEA. She can show this either under *Price Waterhouse* or *McDonnell Douglas.* In presenting such, however, she has to show neither that Arcata's proffered reason for her discharge is false—*Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 82 (2d Cir.1983)—nor that age was the sole factor in its decision—*Geller v. Markham,* 635 F.2d 1027, 1035 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981)—but only that age made a difference. *Hagelthorn v. Kennecott, Corp., supra,* at 82. Once it has been determined whether or not Ross has offered sufficient evidence for reasonable jurors to be able to find in her favor, then this Court must determine whether, as a matter of law, Arcata has established that it would have discharged her regardless of her age.

Ross offers the following evidence to show that she was discharged because of her age:

(1) Statements by Vice President Zimmer that he wanted "new blood" and "fresh blood" in the company;

(2) A memorandum by McCready, the plaintiff's immediate supervisor, that stated the need to ferret out those employees who have peaked and leveled out in their careers;

(3) The plaintiff was the oldest exempt worker in the department and another discharged worker was the oldest non-exempt in the department;

(4) A younger person, whose job was eliminated at the same time as was the plaintiff's, was not terminated but transferred and the plaintiff was not transferred;

(5) Zimmer requested and reviewed a list of people over fifty-five and a list of persons rated as stable by Arcata in their employee evaluations;

(6) Arcata ultimately hired a thirty-five year old person to fill the position held by the plaintiff;

(7) There is no hard evidence that the criteria now articulated by Arcata were in fact used at the time of the plaintiff's discharge.

This Court will address these facts seriatim and the defendant's counter-arguments to each.

The plaintiff claims that statements by Zimmer that he was looking for new blood and fresh blood imply that he was looking to bring young people into the company. Arcata counters that such statements only indicate that Zimmer was looking for new ideas and new methods. While the statements could be interpreted as Arcata suggests, they also could be seen as "metaphors for youth." *Nobler v. Beth Israel Medical Center,* 702 F.Supp. 1023, 1029 (S.D.N.Y.1988). In fact, the former Human Resources Manager interpreted them in just that way. *See* Plaintiff's Affidavit in Opposition to Motion for Summary Judgment, Exhibit B, Affidavit of Frank O'Connor, at ¶ 13. Obviously a single statement in the workplace could not be enough to imply a discriminatory motive, but repeated statements, especially by those involved in the decision as to who will be discharged, can imply such.

The same multiple interpretation problem obtains in discussing the language of McCready's memo. It states that Arcata should ferret out employees who have peaked and leveled out in their careers. Ross interprets "ferret out" as discharge and "peaked" and "leveled out" as old, thereby concluding that the memorandum indicates that older persons should be removed from the company. Arcata argues that McCready simply meant that individuals who were not performing up to par, were in the wrong positions or were performing at their maximum capabilities should be identified. Again these statements can be interpreted by a reasonable person as indicating either or both of the proffered meanings.

Next the plaintiff points to various actions by Arcata that indicate discriminatory intent. Ross claims that she and Kuzon, an executive secretary, were the oldest exempt and non-exempt employees in their department and that both were fired. While this Court notes that an industrial nurse, age 60, is listed on the defendant's list of employees in the department, the plaintiff's point is valid. The fact that three people were removed from the department and that the two who were discharged were among the oldest in the department while the third, a younger employee, was transferred can imply that Ross was treated differently because of her age.

In addition, the plaintiff points out that ultimately a thirty-five year-old man was hired in the plaintiff's position. Technically Ross's job was merged into Rath's job and it was Rath who was replaced by the thirty-five year old. However, form cannot take precedence over substance and it would be reasonable for a factfinder to conclude that such a series of events indicated disparate treatment based on age, especially in light of the fact that Ross was discharged because Rath was better qualified and Rath was, in turn, discharged because of poor job performance.

Ross also points to Zimmer's request for a list of people over fifty-five years of age and a list of people who are stable in their career as an indication of Arcata's discriminatory motives. Arcata claims that such lists were used to consider the effects of pension benefits on their planned restructuring. While there can be no inference of discrimination drawn from the consideration of pension plans—*see Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 922 (2d Cir.1981)—, it is not clear from the evidence that the lists were generated for the purpose of considering pension benefits. In *Stanojev,* the company had prepared figures on pensions to be paid to the plaintiff using different retirement dates. In the present case, Arcata generated a list of employees over fifty-five years of age and a list of persons stable in their careers. These lists did not indicate accumulated benefits but were merely lists of employees and their years of service. Thus it is not

the consideration of pension benefits that is at issue in the present case but the generating of the lists. A reasonable jury could find that the lists were generated to ascertain the impact of pension benefits on the cost of discharging an employee, but it could also find that generating the lists was a way of ascertaining the names of older employees. In addition, while Arcata said it generated the list as part of its plan to reduce employees through voluntary retirements, there is a question whether the lists were generated during the same period in which Arcata was considering the early retirement plan.

Lastly Ross points out that, while Arcata has argued that it acted according to certain criteria in deciding on which jobs would be eliminated, it has produced no written documentation from 1986 establishing the criteria which were used, justifying an inference that Arcata has only recently articulated the criteria to cover its earlier criteria-less decisions. Obviously Arcata denies such but it is unable to produce any contemporaneous documents outlining its contemporary criteria but merely argues that the criteria were developed and applied orally.

Based on the totality of the evidence that Ross has presented, this Court finds that a reasonable jury could find that she was discharged because of her age. In light of this finding, this Court must now address whether Arcata has established as a matter of law that it would have taken the same action regardless of Ross's age. Because Arcata would have the burden of proving this affirmative defense at trial, as the party moving for summary judgment it carries the heavy burden of establishing that the evidence would necessitate the directing of a verdict in its favor. *See Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 250–251, 106 S.Ct. at 2511. Arcata has argued that Ross was fired as part of a reduction in work-force and the elimination of Ross's job title. It can be inferred from this argument that because the job title was eliminated Ross would be discharged no matter what her age was. However, the elimination of a specific job title does not necessarily result from a reduction in work-force. The burden to show that Arcata would have taken the same action regardless of the plaintiff's age cannot be met by simply showing that the job title was eliminated by a work-force reduction. To allow, as a matter of law, such a reason to defeat a plaintiff's claim would make it impossible to bring a successful ADEA claim. Arcata has failed to offer other persuasive evidence that would convince this Court that, as a matter of law, it would have taken the same action regardless of the plaintiff's age and, therefore, there is a question of material fact as to this issue that cannot be resolved on a motion for summary judgment.

Arcata has requested that Ross's state law claim be dismissed because she elected her remedy under Exec.L. § 297 or, alternatively, that this Court refuse to exercise jurisdiction over such a claim. Ross's state law claim and her ADEA claim clearly arise out of "a common nucleus of operative fact" and, therefore, hearing both claims together is favored. *Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Her state law claim is not barred by Exec.L. § 297 because New York's Division of Human Rights dismissed her complaint on the grounds of administrative convenience. *See* Exec.L. § 297 subdivision 9. Therefore, Ross's state law claims will not be dismissed. However, Ross's claim for punitive damages will be stricken because such are not available under Exec.L. § 297. *See Tyler, supra,* at 1191.

Accordingly, it is hereby ORDERED that Arcata's motion for summary judgment is granted as to Ross's claim for discrimination based on national origin, granted as to Ross's claim for punitive damages and denied as to Ross's claims under ADEA and Exec.L. § 296.