**Robert JACQUES, Plaintiff,**

v.

**SIERRA PACIFIC POWER COMPANY, Defendant.**

**No. CV–N–93–404–ECR.**

United States District Court,
D. Nevada.

Dec. 5, 1994.

Erica Michaels, Goedert & Michaels, Reno, NV, for plaintiff.

Suellen Fulstone, Woodburn and Wedge, Reno, NV, for defendant.

### MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT

EDWARD C. REED, Jr., District Judge.

Robert Jacques has worked for the Sierra Pacific Power Company since 1960. In mid-1992, a supervisor's position came open and Jacques applied for the job. He was fifty-six years old at the time. The job went to another Sierra Pacific employee, Tim Berg, who was about twenty years younger. Jacques believes he was denied the promotion because of his age and has brought suit under the federal Age Discrimination in Employment Act (ADEA). To his federal claim, Jacques appends both a claim made under Nev.Rev.Stat. § 613.330—a state statute essentially identical to ADEA—and common law claims for breach of contract and "bad faith" (i.e., tortious breach of contract). (Jacques' complaint also alleged intentional and negligent infliction of emotional distress, but he now concedes that these claims cannot be proved and does not pursue them. *See* Opposition to Motion for Summary Judgment, at 8.) The case is here on Sierra Pacific's motion for summary judgment.

The facts are not in dispute. In March 1992, Sierra Pacific advertised "in-house" a job opening for "Supervisor—Standards and Material Development." About ten employees, including Jacques, applied for the position. *See* Sierra Pacific's Memorandum in Support of Motion for Summary Judgment ("Motion for Summary Judgment"), at 2. Ed Anderson, Sierra Pacific's Director of Electric Systems Engineering (and the person to whom the new supervisor would report), selected certain applicants for interviews; Jacques was not among them. *See* Deposition of Edward Anderson, Exh. 6 to Motion

for Summary Judgment ("Anderson Dep."), at 31. Jacques and other employees complained about the conduct of the selection process; Jacques, in particular, believed he should have been interviewed. *Id.* at 33–34; *see also* Deposition of Robert Jacques, Exh. 4 to Motion for Summary Judgment ("Jacques Dep."), at 10–11.

Anderson and other Sierra Pacific managers then decided to formalize the process by which applicants for the supervisor position were selected for interviews, *id.* at 33, and to begin the selection process anew. Anderson drew up an "Applicant Screening Form," listing ten important criteria for the job. Age was not a criterion, nor was seniority.[1] An interviewing team was assembled, composed of four individuals: Anderson; George Smith, Sierra Pacific's Director of Customer Services Engineering; Larry Holmes, the Director of Central District Customer Operations; and Barbara Giovanetti, a member of Sierra Pacific's Human Resources Department. Deposition of Robert Aramini, Exh. 5 to Motion for Summary Judgment ("Aramini Dep."), at 19–21. There were twelve applicants for the position. *Id.* at 21. Each member of the interviewing team independently reviewed each applicant's written submissions and assigned that applicant a numerical score with respect to each category on the screening form. *See* "Applicant Screening Forms," Motion for Summary Judgment, Exh. 3. On that basis, six applicants, including Jacques, were selected for interviews. *Id.* at 18–24.

The interviews were then conducted. Again, each member of the interviewing team independently rated the applicants, this time by filling out an "Interviewer's Rating Sheet" for each applicant. The "Interviewer's Rating Sheet" listed eight categories in which each applicant was to be rated on a five-point scale.[2] *See* Motion for Summary Judgment,

1. Specifically, the criteria considered were: knowledge of engineering principles; knowledge of standard materials and construction practices; supervision experience; ability to establish and meet long term goals and objectives; proven written and verbal communication skills; ability to establish and maintain priorities among diverse projects; project management experience; ability to network with internal and external customers; knowledge of the CMS Estimating System; and demonstrated leadership abilities. *See* "Applicant Screening Form," Exh. 3 to Motion for Summary Judgment.

2. Specifically, the categories were: education relevant to position; previous experience relevant to position; communication skills demonstrated in interview; present knowledge regard-

Exh. 2. Again, neither age nor seniority was a criterion. Each "Interviewer's Rating Sheet" also contained a space at the bottom for the interviewer's comments.

When the candidates' scores based on their interviews were totalled, Tim Berg was ranked first. He received the highest score of any candidate from Mr. Anderson and Ms. Giovanetti, the second-highest score from Mr. Holmes (who ranked Jacques first), and tied for the highest score (with another, unidentified candidate) in Mr. Smith's estimation. *See* Motion for Summary Judgment, Exh. 2. The numerical scores were not dispositive; Berg was awarded the job only after the members of the interviewing team discussed the matter and determined that there was a consensus that Berg was the best candidate. Anderson Dep., at 47.

■ Like the facts, the applicable law is not in dispute. It is clear that a decision not to promote an employee because of the employee's age can constitute a violation of ADEA. *See Merrick v. Farmer's Ins. Group*, 892 F.2d 1434 (9th Cir.1990). It is also clear that the *McDonnell Douglas* analytical framework developed under Title VII applies to ADEA as well, *id.* at 1436; *see also Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104 (9th Cir.1991), and that the "ultimate burden of persuasion" in an ADEA case therefore remains, at all times, on the plaintiff. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749 (1993).

■ Jacques has, Sierra Pacific concedes, made out a prima facie case. *See* Motion for Summary Judgment, at 6. Sierra Pacific, on the other hand, has articulated a legitimate, nondiscriminatory reason for its decision, i.e., that Berg was a better candidate for the job. The *McDonnell Douglas* framework therefore "simply drops out of the picture," *id.*, and the relevant question, on summary judgment, is whether Jacques has produced evidence, sufficient to create a triable question, that age was a factor in Sierra Pacific's decision not to promote him. He has not, and

summary judgment must therefore be granted to Sierra Pacific.

This is made clear by a review of the documents and deposition testimony submitted by both parties. A review of both the "Applicant Screening Forms" and the "Interviewer's Rating Sheets," Exhs. 2 and 3 to Motion for Summary Judgment, reveals that neither age nor seniority was expressly listed, on either form, as a criterion for evaluation.

The written comments on the "Interviewer's Rating Sheets" contain no mention of age or anything similar. With respect to Jacques, Mr. Holmes wrote "[s]trong technical field background—open question as to how the future would be handled. Responses indicated continuation of previous practices." Mr. Smith felt that Jacques "[d]emonstrated strong field/construction orientation, minimal indication of planning/financial considerations." ' Ms. Giovanetti took extensive notes but apparently made no comments expressing her own opinion of Jacques, and Mr. Anderson's rating sheet for Jacques contained no written comments. *See* Exh. 2 to Motion for Summary Judgment.

Jacques himself, in a deposition, was unable to give any foundation for his belief that he was a victim of age discrimination. The following colloquy is the most relevant:

Q: What makes you think that age, your age had anything to do with the decision to choose Mr. Berg for the position of Supervisor, Standards and Material Development?

A: Three and a half years in the job, commendable MPA evaluations from the former manager and Mr. Anderson.

The three people that filled the job afterwards are all younger than I am.

Basically that's it. That is all I can think of right now at this present moment.

Q: Did anyone in the interview or job application process for this position say anything to you regarding your age?

A: Not to my recollection.

ing desired position; preparation for interview; composure in interview; supervisory skills; and

adaptability to changing corporate culture.

Q: Did anyone in the job application process or interview process say anything directly or indirectly referencing your age or seniority or anything of that kind?

A: Not that I can recollect.

Jacques Dep., at 28–29.

None of the deposition testimony taken from the members of the interviewing team suggests that age was a consideration in the selection process. Asked to explain Berg's selection for the job, Ed Anderson first noted that Berg, unlike Jacques, was a registered engineer. Anderson believed this was a "definite asset," because it meant that engineers in training could work directly for Berg. By contrast, a junior engineer working under Jacques would have to be reassigned to work for a registered engineer for training purposes, and thus, in effect, would have to work for two supervisors at once. Anderson Dep. at 19–20. Perhaps more important, Anderson had misgivings about Jacques' approach to the job:

A: Only one other thing that I can think of off the top of my head, and that has to do with his management style. Jake had a more of a command and control type style, than a participative or mentoring, coaching type of a management style, which with his background in the field work, it's not surprising that that sort of command and control type of style would emerge.

However, it wasn't considered to be effective in an office environment, and I had had similar—I wouldn't call them complaints, but concerns from employees about his management style, terms like, it's Jake's way or no way kind of thing. That didn't go well with some of the people that worked for him.

Anderson Dep., at 22.

George Smith, too, had reservations about Jacques' suitability for the job:

A: [I]f I could characterize Bob's role in this, he would be on the constructing-operating end of the process, and I was on the design part of it.

In that relationship there can be some disagreements over how you design things. . . . .

To be very frank, I thought he was not very cooperative in dealing with the design part of the company. He tended to change the designs when they were put out the way they were for very good reasons, very sound reasons, and I didn't feel that he fostered an attitude of cooperation between the two groups. To the contrary, I thought it was very much a negative in that regard.

Deposition of George Smith, Exh. 8 to Motion for Summary Judgment ("Smith Dep."), at 9.

Larry Holmes gave Jacques the highest score of any of the candidates and believed that Jacques was "best suited" for the job. Deposition of Lawrence Holmes, Exh. 9 to Motion for Summary Judgment ("Holmes Dep."), at 19. However, his recollection of the discussion among the members of the interviewing team at the time the decision was made lends no support to Jacques' claim that age was a factor:

Q: Do you recall what the reasons were that the others expressed for preferring Berg?

A: The others expressed some concern regarding the ability of Jake to hold the group together as a team, whether he would be able to get the most effective performance of the work group that was in Standards at that time.

Q: Was that a concern that related to the group in Standards or Jake's abilities?

A: It was related to his ability to get along with some of the people in that particular work group. I don't think it was pointed in either direction.

Holmes Dep., at 20.

Moreover, these explanations, according to Jacques' own deposition testimony, are consistent with what Jacques was told at the time the selection was made:

Q: What were your discussions with Mr. Anderson after you didn't get the job?

A: I asked him to explain why I didn't get the job.

Q: What did he tell you?

A: He told me that I was not a cost effective supervisor.

He told me that I was a dictatorial type supervisor and that's all that I can remember about the conversation.

. . . .

Q: Did Mr. Anderson make reference to any of the views of the other interviewers?

A: No.

Q: Did you attempt to discuss the matter with any of the other interviewers?

A: No.

Q: At any time?

A: No.

Q: Did you believe Mr. Anderson to be sincere in the reasons that he gave you?

Whether they were good reasons or bad reasons, did you believe him to be honest about it?

A: Yes.

Jacques Dep., at 31, 57.

In short, none of the documents directly related to the promotion decision, nor anything said by anyone involved in that decision, at any time, supports Jacques' assertion that age was a factor in the decision to promote Tim Berg instead of him. To support his argument that a material issue of fact exists as to Sierra Pacific's intent in making the decision, Jacques therefore places almost total reliance on a list prepared in April 1991 by Sierra Pacific, categorizing about 85 employees as "promotable now," "promotable in three to five years," or "not promotable at this time." *See* Exh. A to Opposition to Summary Judgment. Jacques was one of two dozen employees listed as "not promotable at this time." That much is uncontested.

Jacques makes two further assertions: first, that "not promotable at this time" really meant not promotable, period; and, second (and crucial to his case), that all but one of the twenty-four employees listed as "not promotable at this time" were over forty years old at the time the list was drawn up. Whether these assertions are precisely accurate is neither clear nor important at this point; they find some support in the evi-

dence and we must accept them as true for purposes of this motion.

The question, then, is whether the list, by itself, constitutes sufficient evidence to bar entry of summary judgment for Sierra Pacific. The list—again, we assume, *arguendo*, that virtually all of the employees listed on it were over forty and were considered de facto unpromotable—might appear to be precisely the sort of evidence that creates a triable issue of fact for a jury. In light of the facts in this case and of the persuasive reasoning of other courts dealing with closely analogous factual situations, it is not.

First, the list indicates each employee's name, department or district, and current position. That is all. It does not list age, or date of birth, or years with the company. *See* Exh. 3 to Opposition to Summary Judgment. Also, the list was prepared in April 1991, a full year before the contested decision was made.

Second, Larry Holmes—Jacques' superior at the time the list was compiled and thus the person who categorized him as "not promotable at this time," *see id.* at 23–24, a rating assumed, for purposes of this motion, to be equivalent to "unpromotable"—described the list as "a listing of employees who were being evaluated for potential promotion for the *manager* level within the company," *id.* at 23 (emphasis added), and as "a recommendation as to whether the individuals were promotable to the manager level in the company." *Id.* at 25. He made it clear that in categorizing Jacques as unpromotable, what he had in mind was only promotion to the managerial level within the company:

Q: Did you think that Jake was suitable for the Supervisor—Standards Material and Development but not suitable for any managerial job; is that what you're saying?

A: Yes.

Q: And you say that because the manager level is a step higher and requires something different?

A: Yes, a little different skill sets.

Holmes Dep. at 32.

Third, Holmes explained that "I was given a request to do this evaluation of the supervi-

sors in my department," Holmes Dep., at 23, and that he "assumed all directors were requested to provide some recommendations regarding supervisors working for them." *Id.* at 24. Holmes made clear that the list was *not* prepared by a single individual or entity, *id.* at 23, but was, rather, a compilation of the responses received from the directors asked to categorize the supervisors working for them. That is an important distinction. Had the list been prepared by a single manager or committee, Jacques could easily argue that that it was the product of discriminatory intent, because it "just happens" to classify as unpromotable only those employees over forty years old. As a *compilation* of responses, however, the list is tainted by discriminatory intent only to the extent that a director's choice to classify a given subordinate as unpromotable was motivated by the fact that that subordinate was over forty years old. But there is no evidence that Larry Holmes considered Jacques' age at all in listing him as unpromotable.

Fourth, it seems clear that the list, and Jacques' place on it, played no role in the promotion decision. Larry Holmes, of course, knew that Jacques was classified as "unpromotable"; Holmes himself had so classified him. But, as noted above, Holmes considered that to be a judgment about promotability to the managerial level. The promotion at issue here was to a supervisory position. Holmes believed that Jacques was qualified for this job; indeed, Holmes rated Jacques as the best-qualified candidate and argued, unsuccessfully, that it was Jacques, not Tim Berg, who should get the job. Holmes Dep. at 19–20. Holmes's knowledge, moreover, apparently did not taint the other committee members' evaluations of Jacques: Holmes testified that, since making recommendations about his own subordinates, he had not discussed the list with anyone. *Id.* at 26.

George Smith had some knowledge of the list and, apparently, had seen it before. Smith Dep. at 20–21. His testimony does not, however, indicate whether he was aware that Jacques had been categorized as unpromotable, and Smith testified specifically that "my decision was based on my experience

with Bob [Jacques] and what I heard out of the interview," *id.* at 20.

When shown the list, Ed Anderson stated that he had never seen it before, that he had never seen similar lists from other divisions, and that he had prepared a similar list several years earlier, but had not rated Jacques because Jacques was not working for him at the time. Anderson Dep. at 48–51. Apparently, Barbara Giovanetti was never deposed; if she was, her testimony has not been submitted to the court.

Jacques has, in summary, submitted no evidence to suggest that any member of the interviewing team considered the list in making the decision to promote Tim Berg instead of Jacques—no evidence, that is, connecting the list with the promotion decision. The situation is thus analogous to that presented in *Stendebach v. CPC International, Inc.,* 691 F.2d 735 (5th Cir.1982), in which the plaintiff, fired during a corporate reorganization, emphasized the importance of a list of employees, prepared by a corporate vice-president, containing "names, ages, years of service, and grade and performance evaluations." *Id.* at 738. The Fifth Circuit granted summary judgment to the defendant after noting that the list had not been prepared for use in the reorganization and that "[t]here is no evidence that this list was used by the committee members, nor is there evidence that the contents or existence of the list in any way influenced their decisions." *Id.* Sierra Pacific's argument in this case is even stronger, of course, because the list at issue here gave no indication of age or years of service.

This conclusion is supported by consideration of other decisions involving lists of employees proffered as evidence in ADEA cases. As a general rule, it seems that a defendant's motion for summary judgment will be denied where the list expressly indicates date of birth, age, or years of service, and where the plaintiff also submits significant evidence in addition to the list or can show some connection between the list and the contested employment decision. For example, in *Sheerin v. New York Div. of Substance Abuse Servs.,* 844 F.Supp. 909 (N.D.N.Y.1994), the employer had drawn up

an "age chart," listing the name, date of birth and years of seniority of each employee eligible to take advantage of an early retirement incentive program. Sheerin alleged that the chart, though initially drawn up for a legitimate purpose, had been used in a discriminatory manner in making work force reductions. The court held that, in light of Sheerin's statistical showing,[3] "a jury could conclude that the age chart was used in a discriminatory manner, and that age was a motivating factor in the decision to terminate [Sheerin's] employment." *Id.* at 916–17.

Similarly, in *Ross v. Arcata Graphics, Inc.,* 788 F.Supp. 1298 (W.D.N.Y.1992), Ross introduced lists, generated at the request of the company's vice-president, of employees over fifty-five years old and of employees "stable in their careers." *Id.* at 1307. In each case, the list gave the employees' names and their years of service. *Id.* The court noted that "[a] reasonable jury could find that the lists were generated to ascertain the impact of pension benefits on the cost of discharging an employee, but it could also find that generating the lists was a way of ascertaining the names of older employees." *Id.* at 1308. Also, Ross presented considerable evidence, in addition to the lists, of discriminatory intent.[4] Given the "totality of the evidence," *id.* at 1308, Arcata's motion for summary judgment was denied as to Ross's ADEA claim.

In *Madreperla v. Williard Co.,* 606 F.Supp. 874 (E.D.Pa.1985), the court refused to grant summary judgment to the defendant where the plaintiff had "submitted handwritten memoranda and notes and one oral statement of [his superior] indicating consciousness of and concern about the age of management personnel." *Id.* at 877. The court, citing *Stendebach,* noted that "this evidence, by itself, is of doubtful weight," but allowed the plaintiff's case to proceed because he had submitted other, additional evidence of discrimination. *Id.* at 877–78.

In *Herman v. Nat'l Broadcasting Co.,* 744 F.2d 604 (7th Cir.1984), the "person 'responsible for personnel during the changeover'" asked for a memorandum "listing the names of people in film positions, their company seniority, their proposed utilization, and *their dates of birth.*" *Id.* at 609 (emphasis in original). "If age was not a factor in the hiring decisions, why," the court asked, "did the memorandum requested by a top NBC executive, and used by those immediately responsible for hiring, contain such information?" *Id.* In addition to the memorandum, the plaintiffs in *Herman* submitted other direct evidence as well as statistical evidence of discrimination. The Seventh Circuit reversed the trial court's grant of summary judgment to the defendant.

Finally, in *Bernstein v. Consolidated Foods Co.,* 622 F.Supp. 1096 (N.D.Ill.1984), the defendants' motion for summary judgment in an ADEA suit was denied where the plaintiffs came forward with a variety of facts to show pretext, among them a company report which included an organization chart of top management listing managers' ages and "a statement, under the heading 'Management Weaknesses,' 'Age above Average.'" *Id.* at 1103.

On the other hand, *Stendebach,* discussed above, does not stand alone. Other cases also make clear that an employee list, *simpli-*

---

**3.** In summary, that "75% of the employees making over $50,000 who were also age fifty and over were laid off in spite of the fact that this group made up only one-third of the total number of ... employees making in excess of $50,-000." *Sheerin,* 844 F.Supp. at 916.

**4.** Specifically:
(1) statements by the company's vice-president that he wanted "new blood" and "fresh blood" in the company;
(2) a memorandum by Ross's immediate supervisor that "stated the need to ferret out those employees who have peaked and leveled out in their careers";

(3) Ross was "the oldest exempt worker in the department and another discharged worker was the oldest non-exempt in the department";

(4) "[a] younger person, whose job was [also] eliminated ..., was not terminated but transferred";

(5) Arcata ultimately hired a thirty-five year old person to fill Ross's position; and

(6) a lack of "hard evidence" that the criteria "now articulated by Arcata were in fact used at the time of the plaintiff's discharge." *Ross,* 788 F.Supp. at 1306–07.

*citer*, without additional evidence and without any evidence of a connection between the list and the contested employment decision, is not sufficient to create a triable question of fact as to whether age was a factor in the decision, and will, therefore, not suffice to prevent entry of summary judgment for the defendant. For example, in *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990), "Wells, Farmers' executive in charge of selecting the new [special lines representative], chose the younger Hodges over Merrick. Farmers explains that Wells chose Hodges because of Hodges' claims background." Merrick, attempting to show pretext, argued, among other things, that "Farmers' policy of identifying employees as having 'outstanding potential' effectively discriminate[d] against older employees." The Ninth Circuit rejected the argument because, *inter alia*, "Wells was not aware of Hodges' status on the 'outstanding potential' list. Thus, the 'outstanding potential' designation is irrelevant to Merrick's claim." *Id.* at 1439.

Similarly, in *Herber v. Boatmen's Bank of Tennessee*, 781 F.Supp. 1255 (W.D.Tenn. 1991), the plaintiff offered "two lists, one purporting to be an employee list with the birthdays of every employee, and other purporting to be a list of employees over the age of fifty-five...." *Id.* at 1262–63. The court (noting that, because the case involved a reduction in force, the plaintiff could not rely on the *McDonnell Douglas* framework, but instead had to meet a higher standard) granted summary judgment to the defendant on the plaintiff's ADEA claims, noting that the plaintiff "has failed to show that the lists were used" in making the contested reduction-in-force decisions and "had the opportunity to establish that [the person making the decisions] used the lists through deposition testimony and failed to do so. There is no evidence as to who possessed these lists, where they were kept, or for what they were used." *Id.* at 1263. The court distinguished the plaintiff's case in *Herber* from that in *Anastasio v. Schering Corp.*, 838 F.2d 701 (3rd Cir.1988), in which the

> Schering maintained Management Inventory Summaries on which its managers were listed in descending order by age. These summaries also contained backstops (backup managers) for each of its managers, again referenced by age. Anthony Wolfe ([the plaintiff's] supervisor, who made the decision to eliminate his position) had written the birth month and year for each manager who reported to him.

*Id.* at 705. In *Anastasio*, the *Herber* court explained, the plaintiff had produced "specific evidence which linked the list to the supervisor who made the termination decision" and had shown that "the management summaries were used by the supervisor in the termination process." *Herber*, 781 F.Supp. at 1263.

To summarize, then: there is no evidence that age was a factor in the promotion decision. The "unpromotable" list could, in theory, be construed as evidence of age discrimination, but in this case it stands alone. There is no evidence that any member of the committee considered it in making the promotion decision. This must be considered along with the other facts set forth above: that the list was prepared a year before the contested decision was made; that it contained no information which would reveal any employee's age or seniority; that it was a compilation of various directors' independent evaluations of their own subordinates; and that the only interviewing team member clearly aware of Jacques' place on the list thought it irrelevant to this promotion decision, and in fact argued that Jacques *should* be awarded the job.

Taking all the facts together, it is clear that Jacques simply has not come forward with evidence, sufficient to raise a triable issue of fact, that age played a role in the decision not to promote him.

The ADEA claim having been disposed of, this court has broad discretion to refuse to exercise jurisdiction over remaining pendent state claims. *See* 28 U.S.C. § 1367(c)(3); *see, e.g., Hansen v. Lamontagne*, 808 F.Supp. 89, 95 (D.N.H.1992). There is no independent basis for federal jurisdiction over Jacques' other claims, and there appears to be no good reason for the court to retain jurisdiction over those claims as a discretionary matter.

For the foregoing reasons, Sierra Pacific's motion for **summary judgment (Doc. # 9)** is **GRANTED** as to Jacques' ADEA claim.

Jacques' pendent state claims are **dismissed without prejudice.**

The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**