Walter W. GRANT, Plaintiff–Appellant,

v.

HAZELETT STRIP–CASTING CORPORATION, Defendant–Appellee.

No. 1165, Docket 89–7148.

United States Court of Appeals, Second Circuit.

Argued May 18, 1989.
Decided July 26, 1989.

Heather Briggs, Burlington, Vt. (Downs Rachlin & Martin, Anita R. Tuttle, of counsel), for plaintiff-appellant.

John T. Sartore, Burlington, Vt. (Paul, Frank & Collins, Michael J. Harris, of counsel), for defendant-appellee.

Before LUMBARD, PRATT and ALTIMARI, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Walter W. Grant appeals from a judgment of the United States District Court

for the District of Vermont, Franklin J. Billings, Jr., *Judge,* following a jury trial of his claims under the Age Discrimination in Employment Act of 1967 (the "ADEA" or "act"), 29 U.S.C. § 621 *et seq.* Grant claimed that defendant Hazelett Strip–Casting Corporation ("HSCC") discharged him because of his age and in retaliation for his opposition to conduct made unlawful by the ADEA. The jury found (1) that HSCC did not discharge Grant because of his age; (2) that HSCC did discharge Grant in retaliation for opposing conduct made unlawful by the act; and (3) that the retaliation was not willful. On cross-motions for judgment n.o.v., the district court set aside the jury's verdict as to retaliation but upheld its verdicts as to nonwillfulness and age discrimination.

On appeal Grant contends that the district court erred in granting his adversary's motion for judgment n.o.v. and in denying his own. Alternatively, he argues that the court improperly instructed the jury on the elements and relative burdens of proof applicable to his age discrimination claim. For the reasons below, we vacate the judgment and remand for further proceedings.

## BACKGROUND

In the spring of 1974, Grant was hired as controller of HSCC, a position he retained until his dismissal from the company at the end of March 1987. Grant's yearly salary increased steadily during his tenure with HSCC, growing from approximately $17,000 to more than $50,000. As controller, Grant was a member of HSCC's management committee and worked closely with R. William Hazelett, the company's founder, president, and chief executive officer.

The circumstances giving rise to this litigation did not unfold until the months immediately preceding Grant's discharge, when a series of "incidents", as they are now described by HSCC, transpired among Grant, Hazelett, and other members of the management committee. Two of these incidents involved Grant's criticism of hiring and policy decisions made by members of the management committee; a third related to a program of management paycuts insti-

tuted in late 1986; and a fourth involved Grant's handling of insurance policies on Hazelett's personal aircraft. While these incidents appear relatively minor when considered separately, their cumulative effect on Hazelett was unfortunate for him. In late January 1987, Hazelett became so incensed over Grant's failure to find a cheaper insurance policy for his two seaplanes that he came into the office of Peter Regan, the company's vice-president for marketing, "literally shaking", and said "[t]his is just one more thing that I'm having to cope with here * * * I just can't go on like this", and that he "just couldn't work with Walter [Grant] anymore."

At some point during this conversation, Regan suggested that a different position for Grant within the company might be in order. Regan later explained that he believed Hazelett's relationship with Grant was deteriorating, and that Hazelett was becoming preoccupied with Grant, so "I felt it was best that perhaps that we try to find another—a situation where they wouldn't have to work so closely together." According to Regan, Hazelett "thought this was an excellent idea", and told Regan and Jerry Allyn, the vice-president for engineering, to pursue the matter further.

Regan and Allyn first broached the subject of a lateral transfer during two luncheon meetings with Grant in early February 1987. Regan and Allyn discussed Hazelett's reaction to the airplane insurance, and compared the relationship between Grant and Hazelett to "a marriage that's gone bad". Grant testified that he was surprised at these revelations, but nonetheless agreed to think about other positions within the company and to consider any proposals made by Regan and Allyn. Various options were discussed in the weeks that followed, including a three-year consulting arrangement that, in principle at least, appeared to satisfy Hazelett. As a condition of this agreement, however, Hazelett wanted Grant to withdraw from the company's health insurance plan.

Before an agreement was reached, Hazelett asked Grant to assist the company in recruiting a new controller. Grant first

recommended Carolyn Antone, an HSCC employee who had worked closely with Grant, but Hazelett responded that "I don't want a woman in this job. A woman can't do the job." At trial, Hazelett explained that he wanted his new controller to spend time in metal foundries in order to learn all aspects of the business, and that "I have been around the world and I really have never seen a woman in a molten metal plant handling molten metal. * * * So I think, in general, that would pretty well say that a woman would prefer not to—not to—not to get into that type of thing, as much as a man would." There was also testimony from Allyn that no Jewish candidates would be considered because "many years ago the Hazelett family had a very unhappy experience with a group of Jewish financiers, and it left a very bitter taste in their mouth."

But of greater relevance to Grant's age discrimination suit, Hazelett also said that he wanted a younger person in the job. As Hazelett remembered telling Grant during this period, "I think it certainly should be a younger—a younger person." At trial, Hazelett and other members of the management committee gave various reasons for preferring a younger controller, including their perceptions that (1) older candidates would demand a higher salary; (2) older employees "won't be able to be as productive"; and (3) "a person with a lot of experience wouldn't want Bill [Hazelett] telling him what to do."

On March 23, 1987, after consulting with an attorney, Grant approached Hazelett with a memo listing the qualifications desired in the new controller. Hazelett discussed these qualifications with Grant, filled in the salary range, and signed the memo. It reads in full as follows:

March 23, 1987

Bill Hazelett:

With respect to the new controller for Hazelett Strip–Casting Corporation, a recap of the functions I am currently performing is attached.

Last week I discussed with Peter Reagan [sic], Jerry Allyn and yourself the additional qualifications you are looking for. They are as follows:

A "hands-on" fellow who has enthusiasm and energy for a challenging position.

This young man will be between 30 and 40 years old, will have a CPA certificate, the ability to do tax returns, and hopefully a manufacturing background. (If he does not have manufacturing experience, Carolyn, as you pointed out, can train him.)

An optimistic outlook and skills in working with people as well as with numbers will be evident in his qualifications. Initiative will also be a strong point.

Bill, please indicate the salary range you have in mind:

Salary range—$30–45,000 [handwritten by Hazelett]

With your approval, I will get right to work on this.

Walt

Approved: /s/ R Wm Hazelett
RW Hazelett

cc: PCReagan [sic]
JBAllyn

A copy of this memo was given to the company's personnel director, Peter Rowan, who immediately told Grant "this is a no-no" because, as Rowan later testified, the document "was clearly in violation of EEO law." After Grant said that the memo reflected exactly what Hazelett was looking for in the new controller, Rowan replied that they must "protect Bill from himself". Later that day, Rowan and Regan edited the memo to remove any references to age and gender, and asked Grant to destroy all copies of the original memo. Grant refused. Before the day ended, Hazelett and Grant had an argument that the participants remembered as a "shouting match", resulting in a mutual decision that Grant would take the remainder of the week off as "a cooling off period". On March 30, 1987, the day Grant was to return to the office, Hazelett called Grant at home and told him he was no longer an employee of HSCC. The company replaced Grant with a 30–year–old man.

After satisfying the jurisdictional prerequisites for bringing suit under the ADEA, Grant commenced this action on July 14, 1987, alleging that HSCC willfully violated the ADEA by discharging him on account of his age and because he opposed practices made unlawful by the act. At the close of the evidence, the court instructed the jury in accordance with the *McDonnell Douglas* standard for proving discrimination in employment. So charged, the jury found that Grant was not discriminated against because of his age, but that he was retaliated against because of his opposition to conduct made unlawful by the ADEA. The jury also found that the retaliation was not willful. After both parties moved for judgment n.o.v., the district court set aside the jury's verdict as to retaliation, holding that, as a matter of law, Grant had failed to show participation in a protected activity. Judgment was therefore entered for HSCC and Grant appeals.

## DISCUSSION

### A. The Age Discrimination Claim.

Grant claims that the district court erroneously charged the jury as to the evidentiary burdens applicable to his claim of age discrimination. The ADEA protects individuals between the ages of forty and seventy from "arbitrary age discrimination in employment." 29 U.S.C. §§ 621(b), 631(a). The act provides, in relevant part:

It shall be unlawful for an employer * * * to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age * * *.

29 U.S.C. § 623(a)(1). Our interpretations of the ADEA rely heavily on decisions arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, "for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.'" *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (quoting *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)).

In many ADEA and Title VII actions, the plaintiff is unable to produce direct evidence of disparate treatment, such as statements by the employer that it explicitly took age or sex into account in making an employment decision, and must rely instead on circumstantial evidence from which an inference of discrimination can be drawn. In such cases, shifting evidentiary burdens have been designed to allow the plaintiff to prove his case despite the absence of direct evidence. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

In cases where a plaintiff *can* present direct evidence of discrimination, however, the burdens of proof outlined in *McDonnell Douglas* need not apply. *Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1014 (2d Cir.1980) (where direct proof is available, no reason to "adhere stubbornly to [*McDonnell Douglas*] when common sense dictates the same result on the basis of alternative formulae."), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). Once the plaintiff establishes by direct evidence that an illegitimate factor played a motivating or substantial role in an employment decision, the burden falls to the defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegitimate factor into account. *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (plurality opinion); *id* at 1798–99 (O'Connor, J., concurring); *see Berl v. County of Westchester,* 849 F.2d 712, 714–15 (2d Cir.1988). Shifting the risk of nonpersuasion to the employer is sensible in such cases, for as the Court has emphasized,

"[t]he employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not

by innocent activity but by his own wrongdoing."

*Price Waterhouse,* 109 S.Ct. at 1790 (quoting *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983)).

■ Grant presented direct evidence that age played a part in HSCC's actions. Not only did the March 23 memo state that Hazelett was looking for a "young man * * * between 30 and 40 years old", but several witnesses testified that similar statements were made by Hazelett and others. At one point, Hazelett told Grant, "I want a young man and that's what I want and that's what I'm going to have." Furthermore, the company's asserted justifications for preferring a younger controller abound with age stereotypes, such as the belief that older workers are less productive or "wouldn't want Bill telling them what to do". *Cf. Price Waterhouse,* 109 S.Ct. at 1793–95 (comments reflecting sex stereotyping constitute direct evidence of impermissible motive).

This direct evidence, if believed, clearly showed that age played at least some part in HSCC's decisional process. It was for the jury to decide whether it played a "motivating or substantial part" in the dismissal of Grant, and if so whether HSCC had proved that it would have taken the same action without regard to Grant's age. Thus, on the facts of this case, the district court erred in charging the jury under *McDonnell Douglas* instead of requiring consideration of whether liability had been established under the *Price Waterhouse* framework.

## B. *The Retaliation Claim.*

Grant claims that the district court also erred when it set aside the jury's verdict on his retaliation claim. He claims a right to recover under § 623(d) because he established that he was fired for engaging in activity protected by the act.

■ Judgment n.o.v. is warranted only when, viewing the evidence in the light most favorable to the non-moving party,

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against him.

*Singer v. Olympia Brewing Co.,* 878 F.2d 596, 598 (2d Cir.1989) (quoting *Bauer v. Raymark Industries, Inc.,* 849 F.2d 790, 792 (2d Cir.1988)). In granting judgment n.o.v. in favor of HSCC, the district court held that since Grant "had failed as a matter of law to establish participation in protected activity under the ADEA", no claim of retaliation could stand. The crux of this ruling was that the activities relied on by Grant were not "protected".

■ Under 29 U.S.C. § 623(d), an individual has engaged in protected activity if he "has opposed any practice made unlawful by this section" or has "participated *in any manner* in an investigation, proceeding, or litigation under this chapter." (emphasis added). As this choice of language clearly indicates, Congress sought to protect a wide range of activity in addition to the filing of a formal complaint. *See, e.g., EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012–14 (9th Cir.1983) (writing letter to customer of employer complaining about inadequacies in employer's affirmative action program); *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1136–37 (5th Cir. Unit A 1981) (boycotting and picketing of store), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Coleman v. Wayne State University,* 664 F.Supp. 1082, 1092 & n. 5 (E.D.Mich.1987) (stating repeatedly in public and private that university engaged in discriminatory employment practices). Moreover, to establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a "good faith, reasonable belief" that such a violation existed. *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).

Viewed in the light most favorable to Grant, the evidence is more than sufficient to support the conclusion that his actions were protected under § 623(d). The jury could have believed, for example, that in asking Hazelett to approve the March 23 memo, and in later refusing to destroy it, Grant was attempting to gather evidence for a future lawsuit and was therefore "participat[ing] in any manner in * * * litigation" under the ADEA. *Cf. EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y.1975) (Weinfeld, J.) (protected activity where plaintiff discreetly obtained from customer of employer a written description of her job for use by New York City Commission on Human Rights), *aff'd*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Although the district court concluded that Grant's conduct "amounted to nothing more than a self-serving attempt to entrap his employer into the appearance of engaging in age discrimination, where no such discrimination existed", other inferences are equally plausible from the evidence presented. Based on testimony that Hazelett and others on the management committee had orally expressed their preference for a younger replacement, the jury could have concluded that Grant's memo did not *create* the appearance of discrimination but, as Grant testified, merely documented a discriminatory practice that already existed.

The court was also mistaken to the extent it held, as a matter of law, that Grant's conduct was so unreasonable and disruptive that it could not receive protection under the act. We have not before addressed a claim such as this, but the first circuit did so in *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir.1976), a case relied on by HSCC. There, the plaintiff interrupted staff meetings, misused secretarial services, ran up exorbitant telephone bills, invited a reporter to examine confidential salary information, was reprimanded several times for unsatisfactory work, caused two other employees to leave the company, and created numerous other disturbances in her efforts to protest allegedly discriminatory employment practices. These activities persisted over a period of three years before the plaintiff was ultimately terminated. Under these circumstances, and applying the principle that "the employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare", the court ruled that the plaintiff's actions, even though associated with a protected objective, were so extreme as to fall outside the ambit of Title VII. *Id.* at 230–34.

*Hochstadt*, however, is clearly an exceptional case, and we agree with the ninth circuit that it "must be read narrowly lest legitimate activism by employees asserting civil rights be chilled." *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1355 (9th Cir.1984). Grant's activities fall far short of, indeed bear little resemblance to, the prolonged obstreperous acts and misconduct described in *Hochstadt*. Moreover, any disruption of HSCC's affairs seems less attributable to the actions of Grant than to the reactions of those around him, or at least the jury could so find. As pointed out in *Wrighten*, whether plaintiff went "too far in [his] activities and general deportment" is essentially a factual conclusion. *Id.* Thus, it was error on this record to grant judgment n.o.v. on the ground that Grant's conduct was unprotected by the ADEA.

Because the district court addressed only whether Grant had established participation in a protected activity, it expressed no opinion as to whether a sufficient causal link existed between Grant's activity and HSCC's decision to fire him. There is no need to remand on this issue, however, because on the record before us, the jury's verdict on this question must also stand. Hazelett bluntly stated at trial that "we had to" fire Grant "[b]ecause he was in there getting evidence on me to do what's happening today. Simple." This corroborated his prior deposition testimony that "having me sign this memo is the final main reason we decided that something had to be done." Other witnesses testified to the same effect. Such evidence of retali-

atory motive is plainly sufficient to support the jury's conclusion of a causal relation between Grant's protected activities and his discharge.

Contrary to the command of Fed.R.Civ.P. 50(c), the district court failed to rule on HSCC's alternative motion for a new trial when it granted judgment n.o.v. Although appellate courts often remand such cases to the trial court for reconsideration of the motion for a new trial, a remand is not automatic. In light of our "broad power" in this area, *see Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1029–30 (2d Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982), we may instead order entry of judgment on the verdict. 5A *Moore's Federal Practice* ¶ 50.14, at 50–105 (2d ed. 1989). As the fourth circuit has observed, "[i]f the court of appeals may reverse the *grant* of a new trial and order entry of judgment on the verdict, and it seems settled that we may do so, it would seem absurd to hold that the remedy is circumscribed by the failure of the district judge to follow the command of rule 50(c) to rule on the motion for a new trial." *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 110 (4th Cir.1974) (citations omitted) (emphasis in original), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975).

Under the circumstances of this case, including the fact that HSCC fails to raise any reason for a new trial on appeal, *see Oberman v. Dun & Bradstreet, Inc.*, 507 F.2d 349, 353 (7th Cir.1974) (motion for new trial is abandoned if not pursued following entry of judgment n.o.v.), we see no reason to deprive Grant of the benefit of the jury's verdict. Accordingly, we direct the district court to vacate its judgment n.o.v. on Grant's retaliation claim.

## C. *Liquidated Damages.*

█ Grant also argues on appeal that he was entitled, as a matter of law, to liquidated damages and that the district court erred in not granting judgment n.o.v. on this issue.

The ADEA includes a provision for the recovery of liquidated damages in cases of "willful" violation of the act. 29 U.S.C. § 626(b). A violation is willful if " 'the employer * * * knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " *Thurston*, 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) (quoting *Air Line Pilots Association International v. Trans World Airlines, Inc.*, 713 F.2d 940, 956 (2d Cir.1983), *aff'd in part and rev'd in part on other grounds*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 526 (1985)). A showing of willfulness does not require proof of specific intent to violate the act, nor may willfulness be established solely by evidence that the employer knew the ADEA was "in the picture". *Id.* at 127, 105 S.Ct. at 625.

Grant argues that recovery of liquidated damages is "virtually automatic" in all cases of retaliatory discharge. While at least one circuit court has ruled that a finding of retaliation is irreconcilable with a finding of nonwillfulness, *Rose v. Hearst Magazines Division, Hearst Corp.*, 814 F.2d 491 (7th Cir.1987), this court has held that proof of retaliation *may* result in a finding of willfulness, but it need not in every case. *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1256 (2d Cir.1987). In *Dominic*, the jury awarded liquidated damages to a plaintiff who was discharged after filing complaints specifically referring to his statutory rights under the ADEA. In sustaining that verdict, we held

> that where an employee is discharged or demoted because of opposition to a practice made unlawful by Section 4(d) of the ADEA, *see* 29 U.S.C. § 623(d), and where that opposition includes a specific claim that his or her statutory rights under the ADEA are being violated, a trier of fact can find willfulness as defined by *Thurston*.
>
> This conclusion is consistent with a two-tiered liability scheme and will not cause every finding of intentional retaliation to lead automatically to a finding of willfulness.

*Id.*

█ In short, Grant's entitlement to liquidated damages on his retaliation claim

was properly a jury question. Although we might have resolved the issue differently had we been the finder of fact, we are not permitted to substitute our judgment for that of the jury. Thus, we affirm the district court to the extent it denied Grant's motions for a directed verdict and for judgment n.o.v. on the issue of willfulness with respect to the claim of unlawful retaliation.

## SUMMARY AND CONCLUSION

In view of our rulings above, how do we dispose of this appeal? We have concluded:

(1) that the district court improperly charged the jury on Grant's claim of discrimination under the ADEA;

(2) that the district court erroneously granted HSCC's motion for judgment n.o.v. on Grant's retaliation claim; and

(3) that Grant was not entitled to judgment n.o.v. for liquidated damages in connection with the retaliation claim.

On the reinstated verdict for retaliation, the jury awarded $50,000. As the case was submitted to the jury, these were the same damages Grant would have received on his discrimination claim, if the jury had found discrimination. Thus, but for the liquidated damages issue, no new trial would be needed, for the discrimination claim would have become moot. Since Grant could recover his damages only once, we could simply remand with a direction to enter judgment for Grant on the jury's retaliation verdict and its finding of $50,000 in damages.

However, Grant claimed liquidated damages in connection with both the retaliation and the discrimination claims. The evidentiary considerations of willfulness relating to these two claims are different, so that the jury's finding of "no willfulness" on the retaliation claim does not end the matter for the discrimination claim which, we have now held, went to the jury on improper instructions. Regrettable as it may seem, we have no choice but to order a new trial on the discrimination claim—not to determine regular damages, for these have already been fixed at $50,000, but to determine, first, whether HSCC is liable, under proper instructions, for discrimination under the ADEA, and second, if so, whether its offending conduct was "willful". If the new trial determines both issues in Grant's favor, he would thereby recover double the $50,000 award to which he is already entitled on the retaliation claim.

The judgment is therefore vacated, and the case is remanded to the district court for further proceedings consistent with this opinion.