Winthrop F. SHEERIN, Plaintiff,

v.

NEW YORK STATE DIVISION OF SUBSTANCE ABUSE SERVICES; Arthur Y. Webb; Peter F. Pezzolla; John Keegan; and Marguerite Saunders, Defendants.

No. 92–CV–578.

United States District Court,
N.D. New York.

Feb. 25, 1994.

Hinman, Straub, Pigors & Manning, Albany, NY, for plaintiff; William F. Sheehan, of counsel.

G. Oliver Koppell, Atty. Gen. of the State of New York, Dept. of Law, Albany, NY, for defendants; Sue H.R. Adler, Asst. Atty. Gen., of counsel.

### MEMORANDUM–DECISION AND ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION.

Plaintiff brings the instant action seeking damages for the termination of his employment allegedly in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the due process clause of the Fourteenth Amendment. Now before the court is defendants' motion for summary judgment on the ground that plaintiff has failed to make a prima facie case of age discrimination; or in the alternative, that even if a prima facie case has been shown, defendants had a legitimate, nondiscriminatory reason for plaintiff's dismissal, and plaintiff can not prove that this reason was a pretext. Defendants have also moved to strike plaintiff's demand for compensatory and punitive damages, and to dismiss his Fourteenth Amendment due process claim.

## II. SUMMARY JUDGMENT.

A motion for summary judgment may be granted only when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, Partnership v. Medfit Int'l, Inc.,* 982 F.2d 686, 689 (1st Cir.1993); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* In other words, a motion for summary judgment pursuant to Fed.R.Civ.P. 56 shall be granted only when the pleadings, evidence obtained through discovery, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). Therefore, "summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Thus, if the nonmoving party can not produce sufficient evidence to support the jury verdict, summary judgment is proper. *Id.* at 249, 106 S.Ct. at 2510. "In determining how a reasonable jury would decide, the Court must resolve all ambiguities and draw all

inferences against the moving party." *Lang,* 949 F.2d at 580. However, when the moving party has met the burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *see also Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10. At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* "The judge's function is not to weigh the evidence and determine the truth of the matter," *Liberty Lobby,* at 248, 106 S.Ct. at 2510, "such is the prerogative of the finder of fact." *Murphy v. Provident Mutual Life Ins. Co.,* 923 F.2d 923, 930 (2d Cir.1990) (Kearse, J., dissenting), *cert. denied,* ⸺ U.S. ⸺, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991). The judge's role, then, is "to determine whether there does indeed exist a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2511. Moreover, where intent and state of mind are at issue, as they are here, "summary judgment is ordinarily inappropriate...." *Montana v. First Federal Sav. and Loan Assoc. of Rochester,* 869 F.2d 100, 103 (2d Cir.1989).

A careful examination of each party's submissions reveals more disputes than agreement. However, summary judgment will be appropriate if those disputes are immaterial to the ultimate issues before the court. Only those issues in dispute that raise genuine factual issues will be considered. Keeping this standard in mind, the court will examine the respective positions of each party.

## III. *FACTS.*

During the 1990–91 and 1991–92 fiscal years, the State of New York was experiencing a severe budgetary crisis—one which required massive state employment layoffs. Throughout the budgetary crisis, and mainly due to its severity, the Division of Budget ("DOB") attempted to keep a very tight rein on state agencies in the implementation of work force reductions. Of particular concern to the DOB was that the reductions affect employees at all salary levels, and not just new employees or those with lower salaries.

Plaintiff was employed at the Division of Substance Abuse Services ("DSAS") in the fiscal year 1990–91, when it reduced its work force by seventy-seven positions through attrition, funding transfers, elimination of funded vacancies, and early retirement,[1] as directed by the DOB. At the time, plaintiff inquired of Paul Jayne at DSAS's Employee Relations Unit about his eligibility to participate in the early retirement incentive program, but decided not to take advantage of the program. The budget crisis only worsened in the fiscal year 1991–92. DSAS eventually laid off fifty-eight of its employees, including the plaintiff. Plaintiff's claim must be evaluated in light of this reduction in force.

DSAS was a professional service agency[2] whose mission was to develop, fund, and regulate local provider, direct service agencies. DSAS was not itself a direct service agency, and therefore, did not operate any institutions. As a result, it employed mainly a professional staff which accounted for its average salary of over $40,000—21% of its work force earned more than $50,000. In January 1990, defendant Arthur Y. Webb ("Webb") became director of DSAS, and two months later, Webb hired defendant Peter Pezzolla ("Pezzolla") as Deputy Director for Management and Administration, to assist in formulating a strategy to deal with a community development program for which the legislature had appropriated funds. Before coming to DSAS, Webb and Pezzolla were Commissioner, and Associate Commissioner, respectively, of the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"). Plaintiff was officially the Assistant Director of the Management Information and Analysis Unit ("MIA") within DSAS from 1985 to 1991 until his dismiss-

---

1. The governor approved an early retirement incentive program for certain employees fifty years of age or older who had ten years or more of service with the state, and who were not otherwise eligible to retire.

2. In June 1992, DSAS and the Division of Alcoholism and Alcohol Abuse was consolidated by the New York State Legislature.

al. At the time of his dismissal on July 31, 1991, he had been employed by DSAS in various positions for nineteen years. In his position as Assistant Director MIA, plaintiff supervised the two MIA units—Management Analysis, and Management Information Services—which had operated independently before a project directorship position was established by DSAS to oversee these two units.

### A. *Plaintiff's contentions.*

Plaintiff alleges that in or around January 1991, he met with Pezzolla, and was told that an individual by the name of Robert Quick ("Quick") would take over management of the MIA unit, and that he would be assigned to certain special projects. According to the plaintiff, he believed that he had no choice but to accept this reduced assignment. He was thereafter removed from his office, assigned a new secretary, and at no time thereafter did he perform the duties of Assistant Director MIA although he retained the job title.[3] In order to assign plaintiff's duties as Assistant Director MIA to Quick, DSAS requested and received the establishment of a project director position, and despite the fact that Quick was not eligible to be appointed as Assistant Director MIA under the Civil Service Law, he soon took over all of plaintiff's former duties. In fact, the organizational charts within DSAS listed Quick as being assigned to direct the MIA unit, and Quick had begun using the title "Assistant Director MIA" in DSAS documents.

On July 3, 1991, soon after the budget was enacted, and the Governor had disapproved of an early retirement incentive program similar to the one in the previous year, plaintiff was notified that his position was being abolished and that he would be laid off effective July 31, 1991. It is plaintiff's contention that his former duties as Assistant Director MIA were not abolished, but in fact were transferred to Quick in his temporary position as project director, and that he was terminated because his age made him eligible for retirement.

### B. *Defendants' Contentions.*

The defendants present a markedly different view of the events that gave rise to the firing of plaintiff. Not long after Pezzolla became DSAS Deputy Director, he learned that no one at DSAS was performing overall systems management and development. In fact, in late 1990, DOB imposed a three year requirement to implement a computer systems plan to keep pace with the programmatic expectations of DSAS. Apparently the previous director of DSAS was not interested in introducing new technology for updating existing computer systems at DSAS. It was the intention of both Webb and Pezzolla to bring the agency up to speed through computerization. With that in mind, Pezzolla approached plaintiff and asked him if he would develop a proposal for the new systems plan. According to Pezzolla, plaintiff was not interested in developing a systems plan, and instead expressed his intention to continue to work on two special projects, and agreed to relocate to another office.[4] It was then, only after plaintiff declined to develop a systems plan, that Pezzolla asked Quick, whom he knew from OMRDD, and had been hired to manage a federally funded project called Target Cities at DSAS, to provide overall management to MIA, and to direct development and expansion of computerization at DSAS. Defendants assert that plaintiff made himself expendable when he refused to carry out his duties as Assistant Director MIA, and was not interested in developing a systems plan.

Sometime during midsummer 1991, Webb met with senior staff to devise strategies for developing and implementing lost savings strategies, including a significant reduction in

---

**3.** During plaintiff's six year tenure as Assistant Director MIA, he received effective and highly effective performance evaluations. Moreover, he alleges that he never refused to perform any project assigned to him by his superiors.

**4.** Defendants contend that plaintiff, at the time, was not performing broad, overall management functions of the two MIA units, but had narrowed the scope of his functions to oversee two projects. According to Pezzolla, the two units within the MIA were functioning independently of plaintiff, and he therefore, began including the heads of the two units in his staff meetings with plaintiff.

the work force. In making the decision regarding which positions would be eliminated, all functions not directly supportive of DSAS's main mission of funding and regulating local service providers were deemed nonessential. Employees whose functions were deemed not essential were laid off. Because of DOB's concern that all salary levels should be included, the work force reductions were accomplished by trying to lay off a number of staff earning more than $50,000 proportionate to the entire DSAS staff. Defendants maintain that all decisions regarding layoffs were based upon programmatic and operational considerations. Plaintiff's position was allegedly eliminated based upon the limited functioning of his position, and the fact that most of his functions were performed by employees in other positions, the elimination of which would not greatly impact DSAS.

### C. "The Age Chart".

Since the budget crisis had not improved as fiscal year 1991 began, DSAS was planning for additional and more drastic cutbacks for the upcoming fiscal year. In preparing a work force reduction plan, and to satisfy DOB's concern that employees at the upper salary ranges not be insulated from layoffs, DSAS's fiscal management unit prepared a list of the percentage of DSAS employees earning in excess of $50,000.[5] By May 1991, believing that the Legislature would enact an early retirement incentive program similar to the one offered in 1990–91, a list of potential employees who might participate in such a program was complied. (Webb Aff. ¶ 6 & Ex. E; Sheerin Aff. Ex. L) This is what plaintiff has labeled "the age chart"; it consists of DSAS employees, their birth dates, and the dates they began working for New York State. It is undisputed that the list was initially compiled to identify those employees who would potentially be eligible to take advantage of an early retirement incentive program. What the parties dispute is how the list was used after the Governor rejected the incentive program.

5. This list, which is not the over fifty list, projects positions at the $50,000 plus salary level which could be expected to be eliminated through attri-

## IV. *DISCUSSION.*

### A. *Age Discrimination in Employment Act.*

The ADEA makes it unlawful for an employer to discharge an employee because of his age. 29 U.S.C. § 623(a)(1) (1988). Even in the context of a massive reduction in force such as the one presented here, "[a]n employer may not dismiss employees for unlawful discriminatory reasons." *Maresco v. Evans Chemetics,* 964 F.2d 106, 111 (2d Cir. 1992). An employer may, however, discharge an employee based on reasonable factors other than age. *Cf. Hazen Paper Company v. Biggins,* —— U.S. ——, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); 29 U.S.C. § 623(f)(1) (1988). The familiar principles set forth with regard to Title VII claims are also applicable to an analysis of an ADEA claim. *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Russo v. Trifari, Krussman & Fishel, Inc.,* 837 F.2d 40, 43 (2d Cir.1988) (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 323 (2d Cir.1983)). That is, the plaintiff may establish a prima facie case of age discrimination either by indirect evidence showing: "(1) that he was within the protected age group; (2) that he was qualified for the job; (3) that he was discharged; and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination;" *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 359 (2d Cir.1993); *Russo,* 837 F.2d at 43; *Pena,* 702 F.2d at 324; or by direct evidence.

Establishment of a prima facie case by indirect evidence, however, merely raises an inference of discrimination, and "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once the plaintiff has proven a prima facie case of discrimination, the burden of production then shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason." *Id.* Once the

tion, funding transfers, retirements, and elimination of funded vacancies. Eleven such positions were identified.

defendant offers this type of evidence, the *McDonnell*[6]/*Burdine* presumption drops from the case. *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The plaintiff must then persuade the Court that the defendant's proffered reason was merely a "pretext" and that he was the victim of intentional discrimination. *Saint Mary's Honor Ctr. v. Hicks,* — U.S. —, — – —, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993) (The plaintiff retains the ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination). Therefore, under the *McDonnell/Burdine* framework, the court must not only decide whether the proffered reason for the adverse employment decision is a pretext for discrimination, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 1789, 104 L.Ed.2d 268 (1989), but must be convinced that there exists no other reasons suggested in the record that may justify the defendant's actions and that the plaintiff was the victim of intentional discrimination. *Saint Mary's,* — U.S. at — – —, 113 S.Ct. at 2755–56.[7]

■ Since the premise of the *McDonnell/Burdine* pretext analysis is "that *either* a legitimate *or* illegitimate set of considerations led to the challenged decision," *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1789, that framework is inappropriate in cases where there is direct evidence that a discriminatory criterion played a part in the employment decision. *Id.* at 246–47, 109 S.Ct. at 1788–89; *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989). In such a "mixed motives" case, the inquiry is whether the discriminatory criterion was a substantial or motivating factor in the decision making process, such that if it had been absent, a different decision would have been made. *Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. at 1790; *Grant,* 880 F.2d at 1568; *Berl v. County of Westchester,* 849 F.2d 712, 714–15 (2d Cir.1988); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (dual motivation/same decision test). In order to avoid liability then, the burden of proof shifts to the employer to prove by a preponderance of the evidence that plaintiff would have been discharged even if it had not considered the discriminatory criterion. *Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. at 1786; *Grant,* 880 F.2d at 1568.[8] Admittedly, this analytical framework places a heavier burden on the defendant than *Burdine;* but it is reserved for those cases in which there is direct evidence of discrimination in the employment decision.

Accordingly, in a disparate treatment case the fact-finder must first determine whether to apply a "pretext" or a "mixed motive" analysis. *Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12; *Barbano v. Madison County,* 922 F.2d 139, 142 (2d Cir. 1990). If the plaintiff has demonstrated

---

6. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

7. Before *Saint Mary's,* a plaintiff could succeed in proving intentional discrimination solely by disproving the truth of defendant's proffered reasons. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482; *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Lopez v. Metropolitan Life Ins. Co.* 930 F.2d 157, 161 (2d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). However, *Saint Mary's* has worked a significant change in the law.

The fact-finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defen-

dant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.
*Saint Mary's,* — U.S. at —, 113 S.Ct. at 2749. As a result, rejection of the defendant's proffered reasons does not *compel* a finding of intentional discrimination, and although the plaintiff need not bring forth any additional proof of discrimination to succeed, the court must still be convinced that the plaintiff was the victim of intentional discrimination. *Id.*

8. In other words, "once the employee proves that the illegitimate reason played a part in the employer's motivation, the employer loses unless the employer can persuade the fact-finder that the adverse action would have been taken even in the absence of the illegitimate reason." *Davis v. State University of New York,* 802 F.2d 638, 644 (2d Cir.1986) (Newman, C.J., concurring).

through direct evidence that a discriminatory criterion played a substantial or motivating part in the challenged employment decision, then the "mixed motive" analysis of *Price Waterhouse* applies. Consequently, the burden shifts to the employer to prove by a preponderance of the evidence that "its legitimate reason, standing alone, would have induced it to make the same decision" at the time the decision was made. *Price Waterhouse,* 490 U.S. at 252, 109 S.Ct. at 1792; *Barbano,* 922 F.2d at 145. In cases where there is direct evidence of discrimination, then, the fact-finder need not ever reach the question of "pretext". *Grant,* 880 F.2d at 1568. Alternatively, if the plaintiff cannot offer direct evidence of discrimination, the court must give him the opportunity to prove intentional discrimination through indirect evidence under the *McDonnell/Burdine* "pretext" analysis. *Price Waterhouse,* 490 U.S. at 247 n. 12, at 278, 109 S.Ct. at 1789 n. 12, at 1805 (O'Connor, J., concurring). In other words, if the plaintiff meets the initial burden of the "mixed motive" analysis by presenting direct evidence of discrimination, then the fact-finder need not engage in a "pretext" analysis. Therefore, the "key inquiry" at this point is whether there is direct evidence that "impermissible criterion played some part in the decision-making process." *Barbano,* 922 F.2d at 145.

■ Making the distinction between direct and indirect evidence of a discriminatory motive is often difficult. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180–86 (2d Cir. 1992). Presenting direct evidence of discriminatory animus in order to satisfy *Price Waterhouse* does not mean evidence which, in and of itself, shows a discriminatory animus without resort to inference. It is a general rule of civil litigation that a fact may be proved by direct evidence, i.e., noncircumstantial, and indirect or circumstantial evidence.[9] *Id.* Therefore, "direct evidence" as used by the *Price Waterhouse* court[10] means

"enough evidence that, if believed, could reasonably allow [the trier of fact] to conclude that the adverse employment consequences were 'because of' an impermissible factor." *Id.* at 1187. Therefore, purely statistical evidence or plaintiff's qualifications for, and the availability of, a given position would not suffice to satisfy *Price Waterhouse. Ostrowski,* 968 F.2d at 182. Direct evidence does, however, comprise not only specific remarks of persons involved in the decision-making process that reflect a discriminatory animus, but also actions, statements, and documents for which a trier of fact may infer an impermissible bias. *Id.; Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991).

■ The court will now turn to plaintiff's specific claim that there exists both direct and indirect evidence of age based discriminatory animus. Plaintiff presents essentially two pieces of direct evidence which he alleges demonstrates that age was a motivating factor in his discharge. He also presents three pieces of indirect evidence which he alleges raises an inference that his discharge occurred under circumstances indicative of age discrimination and/or disproves defendants' proffered reasons for his discharge.

### 1. *Direct Evidence.*

The first piece of evidence is the so-called "age chart". As noted earlier, the chart consists of those employees who were in a potential position to take advantage of an early retirement incentive program; it lists dates of birth and years of state service of each potentially eligible DSAS employee. Plaintiff alleges that the chart was used by Webb during the summer of 1991, in his haste to make the required work force reductions, to target employees who, because of their age and years of service, were eligible to collect retirement. Although the age chart was presumably compiled for a legitimate reason, plaintiff is not prevented from

---

9. Any circumstantial evidence presented must still be directly tied to the alleged discriminatory animus. *Ostrowski v. Atlantic Mutual Ins. Co.,* 968 F.2d 171, 182 (2d Cir.1992).

10. The direct/indirect distinction was not adopted by the plurality of the court in *Price Waterhouse,* but rather was discussed in Justice

O'Connor's concurring opinion. In *Tyler,* the Second Circuit determined that the Supreme Court had held that in a mixed motive case, a plaintiff must show that an illegitimate factor played a substantial or motivating part in the employment decision. 958 F.2d at 1183.

proving that it was used in a discriminatory manner. If plaintiff succeeds, the age chart would qualify as direct evidence of age discrimination despite the fact that an inference must be drawn that it was used in a discriminatory manner. *Tyler,* 958 F.2d at 1183–83. As evidence that defendants used the age chart in a discriminatory manner, plaintiff alleges that there exists a significant statistical disparity between those employees above fifty years of age who were laid off, and those below. At this point, a word is necessary regarding plaintiff's age subgroup.

Plaintiff's statistics involve a group of DSAS employees earning in excess of $50,000, and who were also over fifty years of age. Although the ADEA makes it unlawful to discriminate against those employees forty years of age or older, there is no absolute bar to subdivide the protected age group in a disparate treatment case. *See Lowe v. Commack Union Free School District,* 886 F.2d 1364, 1372 (2d Cir.1989) ("[W]here discrimination occurs within a protected age group, for example, where those in their fifties are discriminated against in favor of those in their forties, there is nothing to prevent a fifty-five year old plaintiff from prevailing on a disparate *treatment* claim.") (emphasis in the original), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). Moreover, even if the opposite were true, given the unique circumstances of this case,[11] the court is confident that an employer can not circumvent the ADEA by choosing to discriminate against employees only in their fifties as opposed to those in their forties.

It is the defendants, and not the plaintiff, who created an artificial subgroup, for whatever reason, consisting of employees who fell within the protection of the ADEA, and then allegedly discriminated against that group during the work force reduction. It is plaintiff's theory, then, that the age chart is direct evidence of age discrimination in light of the statistical disparity between the pool of potential employees under the age of fifty, and earning over $50,000, who could have been laid off and were not, and those over fifty who were actually laid off. More specifically, plaintiff claims that in 1991, there were ninety-six DSAS employees earning in excess of $50,000; thirty-two of those employees were over fifty years of age and sixty-four employees were under the age of fifty. When the layoffs occurred, plaintiff alleges that all six individuals (including himself) laid off in the over $50,000 range were all over fifty years of age, and all six employees appeared on the age chart. The odds of this occurring randomly is One in 1,023. Defendants, on the other hand, argue that this statistical disparity is flawed because there were actually eight employees laid off at the $50,000 salary range, and two of them were under fifty years of age. (Adler Reply Aff.Ex. A) This defect is not fatal to plaintiff's claim, however.

A review of Exhibit A lists a total of eight employees earning over $50,000 who were laid off as the result of the work force reduction—six employees who were over fifty years of age, and two employees who were under fifty years of age. In other words, six of thirty-two over fifty, and two of sixty-four under fifty were laid off. It is interesting to note, however, that the two employees who were under fifty years of age, were also over forty years of age. However, even if only six out of eight laid off employees were on the "age chart", a jury could infer that the age chart was used in a discriminatory manner given the fact that 75% of the employees making over $50,000 who were also age fifty and over were laid off in spite of the fact that this group made up only one-third of the total number of DSAS employees making in excess of $50,000. Therefore, plaintiff has raised a statistical inference from which a jury could conclude that the age chart was used in a discriminatory manner, and that

---

**11.** Here, we have an allegation that an employer has intentionally subdivided the work force by age and years of service based on retirement eligibility, and then used that list in a discriminatory manner. Because retirement eligibility is based on age (and years of service), an employer would violate the ADEA if it terminated an employee because he or she was eligible to retire. *See Biggins,* —— U.S. at ——, 113 S.Ct. at 1707 (leaving a similar question unanswered). It is the employer, then, who has allegedly discriminated against a chosen subgroup within the protection of the ADEA.

age was a motivating factor in the decision to terminate plaintiff's employment.

The second piece of direct evidence offered by plaintiff in support of his contention is a statement allegedly made by Webb. At the conclusion of a meeting concerning the upcoming work force reduction, Webb allegedly inquired of Michael Mecca, DSAS Deputy Director, about plaintiff's eligibility for retirement. Although Mecca disagrees with plaintiff's interpretation of the statement's context,[12] it is not for the court on summary judgment to judge the credibility and weight of the statement. Moreover, the plaintiff has shown that despite Webb's assertion that he was unaware of plaintiff's age (Webb Aff. ¶ 17), a list of potential employees who might be eligible to participate in the early retirement incentive program was compiled while DSAS prepared for layoffs. (Webb Aff. ¶ 6, Ex. E) It is not a great leap in faith for the trier of fact to infer that Webb, who was responsible for the layoffs as Director of DSAS, did see the list at some point, especially given the intense pressure brought by DOB and the Legislature to cut salaries evenly at all levels. Therefore, plaintiff has satisfied his burden in a mixed-motive analysis presenting direct evidence that age was a motivating factor in the work force reduction, despite the fact that the trier of fact must draw an inference of discriminatory animus. See, e.g., Tyler, 958 F.2d at 1185 ("Even a highly probative statement like, 'You're fired, old man,' still requires the factfinder to draw the inference that plaintiff's age had a causal relationship to the decision.")

In response to plaintiff's statistics, defendants have offered evidence that both before and after the work force reduction, almost 20% of the employees remaining at DSAS were age fifty and older, and that approximately 64% of DSAS employees were forty years of age and older both before and after the work force reduction. Moreover, 55% of the total work force reduction affected employees forty years of age and older, and only 18% affected employees fifty years of age and older. However, such statistics are not relevant in a disparate treatment analy-

sis. Plaintiff does not allege that the entire work force reduction was used in a discriminatory manner. Plaintiff's individual claim is not barred because approximately the same amount of employees in the protected age group remained after the work force reduction.

Moreover, in a disparate treatment analysis, a plaintiff need not show that others in the protected age group were fired as well, or even that someone outside the ADEA protected was hired in their place or otherwise assumed their job responsibilities. See Hollander v. American Cyanamid Co., 895 F.2d 80, 83 (2d Cir.1990) (Fifty-seven year old plaintiff established a prima facie case of age discrimination notwithstanding the fact that when he was discharged, his job duties were transferred to two employees, both of whom were within the ADEA protected age group; one employee was just a year younger than plaintiff). Plaintiff need only address the entire work force reduction if he is seeking to prove that it was instituted in a discriminatory manner. Here, plaintiff has introduced evidence that he was treated differently because of his age, not that the entire work force reduction was instituted in a discriminatory manner.

### 2. *Indirect Evidence.*

Plaintiff also alleges that even if the age chart fails to satisfy his burden under the *Price Waterhouse* "mixed-motive" standard, he has established a prima facie case of age discrimination through the introduction of indirect evidence. *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. There is no dispute between the parties that plaintiff was within the protected age group, that he was qualified to continue working at DSAS, and that he was laid off from DSAS. The defendants do contend that plaintiff cannot show that his discharge occurred under circumstances giving rise to an inference of age discrimination. Plaintiff, on the other hand, has offered three pieces of evidence which he alleges satisfies both his prima facie burden

12. In fact, Mecca alleges that the statement was an off-handed comment to the effect "I understand Ted is thinking of retiring." (Mecca Reply Dec. ¶ 4)

and raises issues of fact disputing defendants' proffered reasons for their actions.

First, the age chart prepared by defendants permits the inference of age discrimination. In *Russo*, 837 F.2d at 43, the Second Circuit stated that an age chart listing the ages of all employees and their eligibility for retirement was by itself sufficiently probative of age discrimination to shift the burden of production to defendant to offer a legitimate nondiscriminatory reason for firing plaintiff. Second, plaintiff alleges that the statistical disparity between those laid off in their fifties as opposed to those in other age groups—as discussed in Part IV(A)(1) above—shows that the age chart was used in a discriminatory manner. Third, plaintiff alleges that his job was not eliminated as defendants contend, but merely that his duties were transferred to a younger employee. Having satisfied his prima facie burden, defendants must now show that they had legitimate nondiscriminatory reasons for plaintiff's discharge.

Defendants have offered several nondiscriminatory reasons for their decision, including the fact that plaintiff was allegedly not performing most of his duties as Assistant Director MIA, that his position was no longer essential to the mission of DSAS, and that plaintiff was unwilling to develop and implement a systems plan for the MIA unit. It must be keep in mind, however, that evidence of a legitimate nondiscriminatory reason does not end the inquiry. The defendants' burden is one of production and not persuasion. Therefore, defendants can not succeed unless plaintiff has failed to offer evidence that their reasons for his discharge were a pretext and that he was the victim of age discrimination.

Plaintiff offers such evidence by alleging that his position was not eliminated, but that his duties were merely reassigned to a younger employee—Quick, and therefore his position was in fact necessary to the operation of DSAS. In fact, the original job posting for Quick's project directorship—one which defendants now allege was requested for the purpose of managing the Target Cities' project—list job descriptions that are virtually identical to plaintiff's as Assistant Director MIA. Moreover, two months before plaintiff's position was allegedly abolished, Quick was identifying himself as "Assistant Director MIA" in DSAS documents.[13] (Sheerin Aff.Ex. P) Therefore, plaintiff has raised a triable issue of fact that the abolition of his position was not the real reason he was laid off, and when combined with the age chart and the statistical inference drawn therefrom, *Maresco*, 964 F.2d at 114 (The same inferences may be drawn to satisfy both plaintiff's prima facie burden, and in response to defendants' proffered explanation), summary judgment is inappropriate.

### 3. Back Pay.

■ Defendants have also moved to strike plaintiff's demand for back pay under ADEA. They do so on the ground that a claim for back pay against a state agency is barred by the Eleventh Amendment. *Farkas v. New York State Department of Health*, 554 F.Supp. 24, 27–28 (N.D.N.Y.1982), *aff'd w/o op.*, 767 F.2d 907 (2d Cir.1985), *cert. denied*, 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985). In *Farkas*, the court held that the ADEA was enacted pursuant to Congressional power to regulate commerce, as opposed to Section 5 of the Fourteenth Amendment, and that therefore, the award of back pay was barred by the Eleventh Amendment. *Id.*

Furthermore, since *Farkas* was affirmed by the Second Circuit without opinion, the weight of authority in the district courts since *Farkas* has been that the ADEA was passed pursuant to Section 5 of the Fourteenth Amendment, and that therefore, monetary damages are recoverable against states and their subdivisions. *See Grossman v. Suffolk County District Attorney's Office*, 777 F.Supp. 1101 (E.D.N.Y.1991); *E.E.O.C. v. KDM School Bus Company*, 612 F.Supp. 369 (S.D.N.Y.1985); *Barrett v. Suffolk*

---

**13.** Additionally, plaintiff alleges that he was told by Pezzolla before the any work force reduction took effect that Quick would take over management of the MIA unit. Up to this point in time, plaintiff had received only effective and highly effective job evaluations.

*Transp. Servs. Inc.,* 600 F.Supp. 81 (E.D.N.Y.1984).

The Supreme Court, however, in *Pennsylvania v. Union Gas Co,* 491 U.S. 1, 18, 109 S.Ct. 2273, 2282, 105 L.Ed.2d 1 (1989), held subsequent to *Farkas* that Congress may abdicate a state's Eleventh Amendment immunity even when enacting legislation pursuant to the commerce clause, provided that Congressional intent is clear and unequivocal. Although the Second Circuit has not ruled whether a state's Eleventh Amendment immunity has been abdicated pursuant to the ADEA, it has recently held that Congress did abdicate state's immunity under the Fair Labor Standards Act, based on the finding that public agencies were included within the FLSA's definition of employer. *Reich v. State of New York,* 3 F.3d 581, 590 (2d Cir.1993). Similarly, the ADEA includes within its definition of employers a state or political subdivision of the state. By explicitly including states in the definition of an employer, Congress clearly intended that states be liable in federal court for monetary damages, including back pay, pursuant to the ADEA.

**B. Due Process Claim.**

■ Finally, defendants have moved to dismiss plaintiff's claim for compensatory damages. Plaintiff's claim for compensatory damages will only survive if he has stated a claim pursuant to 42 U.S.C. § 1983. Plaintiff's § 1983 claim alleges that his position as Assistant Director MIA was abolished and he was removed without a hearing in violation of the due process clause of the Fourteenth Amendment. Defendants provide no legal reason why plaintiff's claim is meritless, only to assert that plaintiff has offered no proof that the actual reason his position was abolished was to remove him from his position without affording him a hearing.

On July 3, 1991, plaintiff was informed by Pezzolla that the position of Assistant Director MIA was being abolished, and that he would be laid off effective July 31, 1991. In a letter dated July 26, 1991, to Webb, plaintiff protested the abolition of the position, and

requested a hearing prior to his termination. He was never granted a hearing.

Plaintiff was a permanent competitive employee and had a property interest in his continued employment at DSAS. As a permanent competitive employee, he had a property interest in his job pursuant to the New York Civil Service Law, and was protected by due process. *Berns v. Civil Service Comm'n,* 537 F.2d 714 (2d Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977).

In *Dwyer v. Regan,* 777 F.2d 825, 833 (2d Cir.1985), *modified,* 793 F.2d 457, 457 (2d Cir.1986), the Second Circuit held that a state need not afford employees a pretermination hearing when it has conducted layoffs pursuant to a substantial reduction in its work force. Only when a single employee is targeted for termination, and that employee protests his termination and contends that it was just a sham and a pretext for the deprivation of his property rights, must the state afford him a hearing. *Id.* The plaintiff has not offered any proof that the work force reduction was a pretext initiated by the state for the purposes of targeting plaintiff for termination, *Bapat v. Connecticut Dept. of Health Servs,* 815 F.Supp. 525, 537 (D.Conn. 1992).

However, the plaintiff has raised an issue whether his *position* was abolished under circumstances which the trier of fact might determine to be a sham or pretext for firing him. Even with a valid work force reduction in place, "the State may not avoid its obligation to provide a pretermination hearing by engaging in sham or pretextual conduct." *Dwyer,* 777 F.2d at 831. In other words, the pretext or sham alleged in this case is not the work force reduction edict, but rather the abolition of plaintiff's position as Assistant Director MIA. Again, the job description for Quick's position, the duties assigned to Quick, the fact that Quick identified himself as the "Assistant Director MIA", and relieving plaintiff of his duties as Assistant Director MIA,[14] all raise a question of fact as to whether the plaintiff's position was really

---

14. These circumstances surrounding the abolition of the Assistant Director MIA position were not related to the work force reduction.

**920**

abolished, or if this was a mere pretext or sham to enable DSAS to fire the plaintiff without a hearing.

### V. *CONCLUSION.*

Notwithstanding the fact that a work force reduction occurred at DSAS, it is the considered opinion of this court that plaintiff has offered direct proof of age discrimination as well as meeting his burden of proving a prima facie case of age discrimination by indirect evidence. The circumstances surrounding plaintiff's job elimination, especially in the context of the work force reduction, present the plaintiff with a series of difficult hurdles. However, plaintiff has produced sufficient evidence from which a trier of fact could conclude that he was discriminated on the basis of age. There is no doubt that DSAS was forced to reduce its work force under the pressure of a budgetary crises. Yet plaintiff has introduced evidence that, if believed, suggests Webb may have hidden behind the work force reductions in an effort to discharge plaintiff because of his age.

Plaintiff has also raised an issue of whether the abolishment of his position and using it as a reason to fire him without granting him a requested hearing, violated his due process rights under the Fourteenth Amendment.

Accordingly, it is ORDERED that

1. Defendants' motion for summary judgment with regard to plaintiff's ADEA claim is denied;

2. Defendants' motion to strike plaintiff's claim for back pay is denied; and

3. Defendants' motion for summary judgment with regard to plaintiff's due process claim is denied.